JOY COSSICH LOBRANO, Judge.
|,The defendant, New Orleans Police Department (“NOPD”) Officer Henry Hollins, was charged with aggravated rape and second-degree kidnapping, violations of La. R.S. 14:42 and La. R.S. 14:44.1, respectively. Following a trial, the jury found defendant guilty of attempted aggravated rape and second-degree kidnapping. The trial court sentenced defendant to forty-five years for the attempted aggravated rape and forty years for the second-degree kidnapping conviction. Defendant timely appealed.
At 10:30 p.m., on June 30, 2009, the defendant and his partner, NOPD Officer Thomas Clark, were on routine patrol in the 1200 block of Thalia Street, when they came upon the victim standing next to a white van. As the victim reached into the van’s window to retrieve her purse, the police officers shone a light in her face and told her to step away from the van. The officers then approached the victim, ordered her to place her hands on the front of their police car, and asked her name. The victim complied, but gave the officers her daughter’s name instead of her own. At the time, several people were in the area, including the victim’s uncle who informed the officers that the victim had given them a false name. The victim then told the officers her real name. A computer search of her |2name revealed no outstanding warrants. The officers also searched the van and its perimeter, but found no drugs. Although the officers detected no odor of alcohol on the victim, Clark believed she was high on drugs. He did a pat down search on the victim and *847 arrested her for public intoxication and misrepresentation of her name. Clark and the defendant then drove the victim to the Sixth District station to obtain the forms needed to process the victim and to allow Clark to use the restroom. However, they neither completed a written police report of the incident nor did they radio dispatch that they were transferring the victim to the station.
The officers arrived at the station between 12:30 a.m. and 1:00 a.m., and when Clark exited the patrol car to retrieve the processing forms, the defendant informed him that he was going to return and release the victim in the area of the arrest and then go home. Consequently, Clark did not file an arrest affidavit or complete any processing forms on the victim. Instead, he left the station and went home, even though his shift did not end until 3:00 a.m.
Meanwhile, the defendant drove the victim through the sally port, exited onto the street and around the station one more time, stopping at the stop sign on Felicity Street. Another NOPD officer, who was standing near the stop sign, approached the defendant’s patrol car, asking “What’s up, man?”, and looked at the victim in the backseat the car. After the officers exchanged words, the defendant drove the car onto Felicity Street. As they rode, the defendant asked the victim what she could do for him if he let her go free. While she responded that she did not understand what he was asking, she understood the defendant was trying to set her up on a solicitation charge. The defendant continued to drive around the city, from one end to the other, all the while asking her what she could do for him.
|3Eventually, the defendant drove the victim to a dark, abandoned building area near the Wal-Mart on Tchoupitoulas Street. When the vehicle came to a stop, the defendant told the victim: “[I] ain’t never had no Mississippi pussy before. You will be my first.” The defendant got out of the car and checked the perimeter to be sure the area was empty. When the defendant returned to the car, he was naked except for the condom he was wearing. He ordered the victim out of the car and removed her pants because she was still handcuffed. He raped her and redressed himself not in his uniform but in pajamas he had retrieved from the trunk. He uncuffed the victim, allowed her to redress, and put her in the back of the car once again. He then told her, “We’re going to make this an every Sunday thing, as long as you keep your mouth quiet.” The victim, fearing for her life, agreed so that she could get away from him. The defendant drove her back to South Saratoga Street to Gladys’s Bar and released her. He instructed her, “If anybody asks why we kept you so long, just tell your uncle and them we ran your fingerprints and your name in the NCIC and we couldn’t find anything on you, and so we turned you lose.”
Upon her release, the victim called her uncle and told him what had happened. The victim’s uncle told her to come home and not to shower and that we would handle the matter at daybreak. The victim arrived at her uncle’s residence sometime after 3:00 a.m., shaking and crying hysterically. The following morning, the victim, her uncle and the uncle’s girlfriend drove to the area near Wal-Mart so that the victim could identify the location where the rape occurred. As the trio approached the location, the victim’s uncle could see tire tracks which he believed may have belonged to the vehicle the defendant used to transport the victim to the area the night before. The uncle collected three used |4condoms at the site — the victim identified one of the condoms as the one *848 the defendant used to rape her. The uncle reported the attack to the police, and the officer told the victim to go to the Second District station. Sgt. Lawrence Jones and Sgt. Lisa Mims transported the victim to University Hospital where she underwent a sexual assault examination, after which the police confiscated the clothing she was wearing at the time of the attack. While at the Second District station, the victim’s uncle identified pictures of the crime scene. The victim identified the defendant as her attacker based on the name on his uniform shirt.
At trial, Lt. Lorenzo testified that on July 1, 2009, at the request of the NOPD Public Integrity Bureau (PIB) on July 1, 2009, he was appointed to investigate the case because of the allegations of police misconduct. Accompanied by Det. Corey Lymous, Lt. Lorenzo met with Sgt. Jones and the victim at Tchoupitoulas and Felicity Streets and went to the location of the rape. Lt. Lorenzo explained that the scene of the crime was in a courtyard behind an abandoned warehouse in the vicinity of the 1800 block of Tchoupitoulas Street. The scene of the crime was hidden from the street and so isolated that it could only be accessed by a dark, deserted, dirt road between the unoccupied warehouse and the Mississippi River flood wall.
That same day, Lt. Lorenzo took recorded statements from the defendant and Clark at the PIB office. Lt. Lorenzo later obtained the rape test results and deposited them in Central Evidence and Property (CEP) for further testing. Lt. Lorenzo and Det. Lymous also obtained a statement from the 'victim’s uncle. Based on the investigation, Lt. Lorenzo developed the defendant as the suspected rapist. He presented the victim with a photographic lineup from which she identified the defendant as her attacker.
|¡;Sgt. Kevin Stamps, Sr., testified that he, too, was a PIB investigator involved in the investigation. Based on the statement he obtained from the victim, Sgt. Stamps obtained search warrants for the defendant’s marked police unit 611 and his residence. The residence search produced various items of clothing, swat boots, NOPD uniforms, currency, social security and insurance cards, a rights of arrestee card, a handcuff key and writing pens. Sgt. Stamps learned that the defendant shared the residence with his girlfriend. Hair and fiber samples were taken from the defendant’s patrol car. Sgt. Stamps catalogued the contents of the trunk of the patrol car: a backpack, toiletries, socks, sex toys, dildos, condoms, male enhancement supplements, vitamin, personal lubricant, adult themed videos, sweatpants, t-shirts, underwear, aspirin, antacid, a Glock .40 caliber Smith & Wesson with laser sight, water, gum, a sports drink, taser and handcuff holsters, a flashlight, two pairs of handcuffs, pepper spray, a duty belt, and live ammunition.
Sgt. Darryl Watson of the PIB testified that he received a call from Lt. Errol Foy in the early morning of July 1, 2009, advising him of the rape complaint lodged against the defendant. Sgt. Watson immediately began investigating the complaint, focusing on the defendant’s employment records, trip sheet records and his location on the night of the crime. When Sgt. Watson and Lt. Foy went to the defendant’s residence to talk with him, the defendant informed them that he had retained counsel and declined to speak any further. Eventually, Sgt. Watson and Lt. Foy were notified that Sgt. Stamps had obtained search warrants, so they secured the area awaiting his arrival with the warrants. The defendant’s girlfriend directed the officers to his belongings in the residence. Crime lab techs arrived and seized the defendant’s clothing, which matched *849 the description given by the victim. The lab techs also processed the defendant’s patrol car. In the trunk, the officers 16located some pajama pants that matched the description given by the victim of the pants she said the defendant put on after the rape. The search of the red backpack in the trunk produced various items of clothing, three dildos, and toiletries.
Technician Geselle Roussel, a supervisor of 911 operators and dispatchers, verified the 911 call played to the jury was in fact the 911 call made by the victim the morning of her attack.
The defendant’s girlfriend testified that she was living with the defendant and her two children in 2009. Although she did not remember the time, she confirmed that she called the defendant on the night of the incident, and he told her he was leaving the jail and on his way home. At 12:30 a.m., on July 1, 2009, the defendant was not at home, and in fact, the defendant did not return until 3:00 a.m. For his shift beginning on June 30, 2009, the defendant dressed in full uniform. She recalled that the defendant had a take home patrol car and never allowed her to look in the trunk of the vehicle. On the morning of July 1, 2009, the defendant returned home in full uniform. That morning when the police arrived to speak with the defendant, he was hesitant to answer the door. When the defendant’s girlfriend asked the defendant what he had done, he said nothing. The police entered, searched the residence, and confiscated the defendant’s belongings from a hall locker.
Ms. Emily Martinez, crime lab technician, received a call at 8:15 a.m. on July 1, 2009, to process the crime scene in this case by taking photographs and gathering evidence. Her investigation generated a report in which she listed the evidence she seized at the crime scene and the victim’s home, including the clothing the victim wore the night of the incident. She collected the defendant’s uniform and shirt with the defendant’s name sewn on it from the defendant’s 17residence. Ms. Martinez also obtained gravel samples, casts of tire tracks and a footprint from the crime scene. She collected and packaged the evidence and submitted it to CEP. Ms. Martinez marshaled the contents of the trunk of the defendant’s patrol car: duty belt, taser, flashlight, handcuffs, asp, pepper spray, cell phone holder, gun holster, clothing, toiletries, hygiene products, three dildos, bag of sex toys, three packs of condoms, food and water.
Det. Lymous testified that he processed the crime scene. He and crime lab technician, Troy Vickers, photographed the defendant’s impounded patrol car. Vickers tested the interior of the vehicle for the presence of bodily fluids and obtained three stains to sample. The vehicle was tested for fingerprints, but only one thumb print was found. The following day, Det. Lymous emptied the patrol car of a towel, a bag of condoms — some used and some still packaged-socks, vitamin supplements, sexual enhancement supplements, blank police forms and manuals, various caliber bullets, a flashlight, a camera, memory drives, keys, handcuffs, a duty belt, drivers’ licenses and binoculars. He packaged the items and deposited them in CEP.
In further testimony, Det. Lymous identified the defendant’s trip sheet for the defendant’s tour of duty from 3:00 p.m. June 30, 2009, to 3:00 a.m. July 1, 2009. He explained that the sheet listed various instances of traffic stops, suspicious person reports, pedestrian stops, fights, and other miscellaneous complaints throughout the defendant’s twelve-hour tour of duty. The last entry reflected a traffic stop at Jackson Avenue and Derbigny Street from 11:50 p.m. to 11:53 p.m. on June 30, 2009. Notably, the sheet did not reflect any ac *850 tivity after 11:50 p.m. Also, nothing indicated that the defendant stopped a female at Saratoga and Thalia Streets after 11:50 p.m. on June 30, 2009, even though on-duty officers Rare required to document all activity during their shift on their trip sheets. The defendant’s time sheet contained no notations of any activity after 11:53 p.m. on July 30, 2009, even though the defendant indicated he had worked until 3:00 a.m. on July 1, 2009. The victim’s name did not appear on the time sheet, nor was there any indication she was ever arrested.
Clark testified that on June 30, 2009, he was working a twelve-hour shift, 3:00 p.m. to 3:00 a.m. Initially, Clark started his shift with Officers Gantner and Bax. When the defendant eventually showed up for work at approximately 8:30 p.m., Clark rode with him in police unit 611. The defendant drove their police unit while Clark tended to paper work. Clark identified the daily activity report filled in by him and the defendant on June 30, 2009. The report indicates that the defendant appeared for roll call at 3:30 p.m. that day; however, Clark said that the defendant did not appear for roll call. The next several items listed on the activity report indicate several miscellaneous stops ending at 11:53 p.m. on June 30, 2009. That was the last activity reported that day. There is no evidence that the defendant and/or Clark made any arrests on June 30, 2009. Clark verified that the activity report did not reflect that the victim had been arrested at any time during his and the defendant’s shift, but he explained that he forgot to note on the activity sheet that he and the defendant arrested the victim. He says he intended to complete the report at the Sixth District Station at the end of his shift, but he admitted that he did not take the paper work into the station for completion. Clark admitted that he was not at the station at 3:00 a.m. for completion of his shift. He also said he was told that the defendant would complete the activity sheet for him. Clark admitted that he did not know whether the activity sheet was ever turned in or whether there was any documentation on record memorializing the victim’s |9arrest. He testified that he never checked with the defendant concerning whether, and if not, why, the activity sheet was ever turned in.
The victim’s uncle testified that he had convictions for manslaughter, felon in possession of a firearm, simple burglary, possession with intent to distribute crack cocaine and possession of heroin. He verified that the victim had been visiting him in town for about three weeks prior to this incident. He explained that the victim suffered from rickets as a child and that the malady left her with uncontrollable shaking and stuttering. Her gait was uneven, and at times she would appear to be intoxicated. He recounted that on the night of June 30, 2009, he, the victim and several friends were sitting in the 1200 block of Thalia Street listening to the radio. The victim’s uncle testified that the victim was standing by his van getting something from her purse, when the police drove onto the block. When the police noticed the victim, they shown a spot light on her, and then the defendant ordered her to step away from the van and approach the police car. After the victim talked to the police for about ten minutes, one of the officers asked that the victim’s uncle identify himself. After he identified himself, the police asked him to reveal the true name of the victim and he told them the victim’s real name. The defendant commented that the victim had given them a different name. After about ten minutes, the police put the victim in the patrol car and started to leave. The defendant told the uncle that he “[was] tak *851 ing her to jail for misrepresentation of name.” 'The victim’s uncle and his friends sat in the area until about 3:00 a.m., after which the victim arrived at his residence, visibly shaken. She told her uncle that the defendant did not take her to jail but rather to Tchoupitoulas Street near Wal-Mart where he raped her. The victim’s uncle testified that the following morning, he drove to the Wal-Mart area ■with the victim |inand his girlfriend so that the victim could identify the location where the rape had occurred. At the site, they collected three used condoms. The victim’s uncle testified that he reported the attack to the police, and the officer told the victim to go to the Second District station. Officers from the PIB interviewed the uncle, and he identified pictures of the crime scene.
The State called a woman, KC, who testified that on May 1, 2009, she was involved in a vehicular rear end collision in New Orleans. The defendant was the officer who arrived on the scene to investigate the accident. He ran her name through the police computer and discovered that there was an attachment for her related to traffic tickets. The defendant placed her in the patrol car and drove to a location across Canal Street — a dirt parking lot with some trees. During the ride, the defendant and KC did not speak. The defendant parked the car at the location for “quite a while” and made a cell phone call asking someone to pick up something for him. A few minutes later, the police dispatcher called and asked the defendant’s location. He informed dispatch that he had to make an arrest, but he gave no other information. By this time KC was scared and apprehensive. The defendant exited the police car and began rummaging in the trunk. After that he walked to the driver’s side of the car and began searching for something under the driver’s seat. Then he opened the back door and reached between KC’s legs. The defendant got back in the car and began to drive. He asked her, “You want to go to jail?” She replied “no.” He said to her, “Well, what could you do for me?” At first KC thought he might be referring to money, but as the conversation continued, she realized he was referring to sexual favors. He drove KC around some more and wound up at the police station off St. Claude Avenue. He and she stood outside near the car for a “real long time,” while he looked through some files. |1TThe pair drove away from the station; all the while the defendant was asking her background questions. He drove to a cemetery across the street from the Iberville Project. The area was deserted with no way for her to get any help. Again, the defendant began badgering her about what she could do for him. She offered to pay him money on a monthly basis or cook for him, which he refused. The defendant transported KC to Central Lockup, but they did not go into the station. The badgering began anew with the defendant telling her that once he made a phone call, it would be too late for favors and she would go to jail. She told the defendant she would rather go to jail, which she did for one night. She called her boyfriend and told him of her harrowing ordeal. Her boyfriend told her they would file a complaint, but she begged him not to because she feared retribution from the defendant. She spoke with a female officer from Internal Affairs who wrote a report.
The State also called Marlon Defillo, Deputy Superintendent in charge of Field Operations for the NOPD. The defense stipulated to Defillo’s expertise on NOPD policies and procedures, regulations, codes of conduct, police equipment, standards of operations and practices, as well as conformity therewith.
*852 Defillo identified and reviewed the defendant’s trip sheet for June 30, 2009. He noted that the defendant had logged into CAD (computer aided dispatch) at 8:42 p.m. but did not receive his first call for service until 10:02 p.m. relative to a fight at Freret Street and Jackson Avenue. Defillo noted that during that six-hour period from 3:42 p.m. to 10:02 p.m., the defendant did nothing. Moreover, there was no required documentation supporting the notations on the trip sheet. In fact, the CAD report and the defendant’s trip sheet were not compatible with one another, which Defillo deemed unacceptable and highly unusual. Additional | ^review of the trip sheet did not indicate that the defendant stopped the victim at 11:55 a.m. or at any time. Judging by the lack of uniformity between the CAD report and the trip sheet, Defillo said that the NOPD never received notice that the victim had been taken into custody on July 1, 2009, because the defendant failed to report his action via computer as required. Even though the defendant’s trip sheet indicated approximately twenty actions taken in between the time he signed on for duty at 3:42 p.m. and the 10:02 p.m. dispatch call concerning a fight, those twenty actions the defendant claims to have taken were not reflected on the CAD report. Defillo emphasized that the trip sheet was the defendant’s account of his actions. The CAD report was the controlling record, and the defendant’s trip sheet did not match the CAD report. In Defillo’s opinion, the trip sheet was suspect. Moreover, Defillo identified several trip sheets bearing various dates which were signed by the defendant but not turned in as required by police operating procedures.
Ms. Angel Edwards, a witness for the defense, testified that she had been friends with the defendant’s wife, Mrs. Hollins, for about eight years and attended a birthday party for her in February 2009 at the defendant’s residence. She described the birthday party as a female adult “fun” party, where a male stripper entertained the party goers, and Mrs. Hollins purchased sex toys for the defendant.
Mrs. Hollins testified and corroborated Ms. Edwards’ testimony about the “fun” birthday party at her home. Ms. Hollins distinctly remembered placing her gifts in a black and red knapsack. Ms. Hollins identified the knapsack in court as belonging to her. She said that the defendant mistakenly put his clean laundry in it and returned to New Orleans. Even though she and the defendant were married, they were not living together in 2009.
| ifjThe defendant took the stand and denied raping and handcuffing the victim the night of the incident. He described the 1200 block of Thalia at night as a hot spot for drug activity and prostitution. The defendant explained that he made a number of stops during his tour of duty on June 30/July 1, 2009, which are documented on his trip sheet. He related that on the night of incident, his attention was drawn to the victim when she threw something into a white van. He turned his spotlight on and ordered her to step away from the van. Clark escorted her to the patrol car. The defendant began to run the name she gave the officers. Eventually, the defendant received the victim’s true name from her uncle. Next, the defendant opened the trunk of his patrol car to look for an eye light to perform a pupil check on the victim. As he was looking for the light, the victim was standing next to him and saw him move his red and black bag and move aside some sweat pants and toiletries. The defendant placed her in the rear seat of the patrol car, and he told her she was being arrested for giving a false name and for public intoxication. The officers and the victim drove to the Sixth District Station so that Clark could com- *853 píete an affidavit to document the victim’s arrest. The defendant parked at the front door of the station while Clark went into the station. After the victim told the defendant she had drug information he might find useful, he suggested that if the information was good she would not be arrested. The defendant recounted that the victim gave him the names of major drug dealers and locations of drug dealing in the city. After receiving the information, the defendant decided to “cut her loose,” but before he let her go, he gave her several condoms he had in the trunk of his car. As for the box of used condoms found in the trunk of defendant’s patrol car, the defendant explained that the condoms were evidence in a paternity suit against him.
| uContinuing his testimony, the defendant said that at the end of his shift he parked his patrol ear and entered the Sixth District Station to complete his paper work for the night. He identified the unsigned trip sheet for the night as well as twelve other unsigned time sheets seized from his patrol car as belonging to him. The defendant explained that the unsigned time sheets, including the one relative to this ease, were not turned in because there were merely drafts of the final sheets he did turn in.
Under cross-examination, the defendant said he turned in his time sheet the night he completed his shift. He could not explain why the police department did not have it. He also could not account for the field interview card concerning the victim, though he said he turned it in at the Sixth District Station. Further, he said he turned the trip sheet and the field interview card in together. The prosecutor then turned to the adult videos confiscated from the trunk of the defendant’s patrol car. The defendant identified approximately twenty provocatively titled DVDs and said that he chose to store them in the patrol car for no particular reason. He also identified a box of used condoms removed from the trunk of the patrol car. He said the condoms were his, and that they were in his possession as evidence in a paternity suit against him.

ERRORS PATENT

A review of errors patent on the face of the record reveals two sentencing errors.
First, on the defendant’s conviction on count one, La. R.S. 14:42(27), attempted aggravated rape, the judge failed to impose the sentence without benefit of parole, probation or suspension of sentence.
11sSecond, on count two, La. R.S. 14:44.1, second-degree kidnapping, the court failed to order that at least two years of the sentence be served without benefit of parole, probation or suspension of sentence. Generally, in instances where the statutory restrictions were not recited at sentencing, they are contained in the sentence, whether or not imposed by the sentencing court. La. R.S.15:801.1(A); State v. Hall, 2002-1098, pp. 7-8 (La.App. 4 Cir. 3/19/03), 843 So.2d 488, 495, citing State v. Williams, 2000-1725, p. 10 (La.11/28/01), 800 So.2d 790, 799. However, in this instance with respect to the kidnapping sentencing, because the sentencing judge is afforded discretion with regard to the number of years the sentence is to be served without benefit of parole, probation or suspension of sentence, the matter must be remanded to the trial court for this determination.

COUNSELED ASSIGNMENT OF ERROR NUMBER 5 PRO SE ASSIGNMENT OF ERROR NUMBER 3

By these assignments, the defendant complains that the evidence is insufficient to support his convictions.
*854 In State v. Hearold, 603 So.2d 731, 734 (La.1992), the Louisiana Supreme Court explained the type of review to be used when issues are raised on appeal both as to sufficiency of the evidence and trial errors:
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and | if,any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot.
On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. If the reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient. Lockhart v. Nelson, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). [Footnote omitted.]
Accordingly, the court must proceed first to determine whether the entirety of the evidence, both admissible and inadmissible, was sufficient to support defendant’s convictions for attempted aggravated rape and second-degree kidnapping.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291, 1293. In addition, when the State uses circumstantial evidence to prove the elements of the offense, “La. R.S. 15:438 requires that ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.’” State v. Neal, 2000-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442, 443. “Where there is conflicting testimony about factual matters, the resolution of which [^depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.” State v. Allen, 36,180, p. 5 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, 626 (citations omitted). The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion *855 only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, 1034.
“In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.” State v. Gaddis, 07-395, pp. 7-8 (La.App. 5 Cir. 11/13/07), 973 So.2d 21, 25 (footnote omitted).
In this ease, the defendant was convicted of attempted aggravated rape and second-degree kidnapping. Aggravated rape is defined as “the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent” committed “[w]hen the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution” or “[w]hen the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.” La. R.S. 14:41(A); La. R.S. 14:42(A)(2) and (A)(3). La. R.S. 14:27, which defines “attempt,” states that “[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.” By definition “[a]n attempt is a separate but lesser grade of the intended |18crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.” La. R.S. 14:27(C).
A review of the trial transcript in this case reveals there was sufficient evidence on which the jury could have based its verdict. The State proved the aggravated rape through the testimony of the victim. She unequivocally identified the defendant as her assailant from the very beginning of the investigation. She identified him through a photo lineup and at trial. She testified that she recognized the defendant by his name sewn on his uniform shirt. Further, although the defense argued that the timeline established by the victim’s testimony was flawed, the State disproved that argument via official police records, which disproved the defendant’s rendition of events the night of the incident. Moreover, the jury heard the victim’s testimony about her inability to resist. Not only was she handcuffed in the rear of the police car, she was prevented from resisting by the threat of great and immediate bodily harm accompanied by the defendant’s power of execution because he was armed. The jury was aware that there was “no physical evidence of sexual activity in the police car, nor on her clothes, on her body, or on the [defendant’s] clothes.” However, in the case of sexual offenses, the victim’s testimony alone can be sufficient to establish the elements of a sexual offense, even if the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. Gaddis, 07-395 at pp. 7-8, 973 So.2d at 25. The jury chose to credit the victim’s testimony over that of the defendant’s testimony. The evidence was sufficient to support the conviction. The jury did not err by accepting the victim’s testimony.
|19The defendant also argues that the evidence is insufficient to support his conviction of second-degree kidnapping.
La. R.S. 14:44.1, relative to second-degree kidnapping, provides, in part:
*856 A. Second degree kidnapping is the doing of an of the acts listed in Subsection B where in the victim is:
(1) Used as a shield;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
(3) Physically injured or sexually abused;
(4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
A simple reading of La. R.S. 14:44.1 reflects that any one of the elements enumerated in Subpart B combined with any of the elements enumerated in Subpart A completes the crime of second-degree kid-naping.
The defendant argues that the State failed to prove that a kidnapping occurred because the officers made a valid arrest based on probable cause for the victim’s misrepresentation of her name and public intoxication. In light of the valid arrest, he contends the officers were authorized to transport the victim from the location of the arrest to the Sixth District station. The defendant further argues Rpthat the State failed to prove that he forcibly seized or carried that victim from the Sixth District station to the remote where the alleged sex act occurred.
The defendant’s argument is unfounded. False imprisonment is defined as the intentional confinement or detention of another without consent and without proper legal authority. La. R.S. 14:46. The essential difference between kidnapping and false imprisonment is that kidnapping involves the additional element of asportation, i.e., moving a person from one place to another.
The defendant’s initial seizure of the victim was justified by virtue of La. R.S. 14:108(b)(l)(c) — providing false identifying information to an officer. However, the justification for the victim’s detention ended when the defendant transported the victim to the Sixth District station and did not book her with an offense. See La. C.Cr.P. art. 213(1). The defendant’s detour from the police station, with the victim handcuffed in the back of his patrol car, to the “river bends” (the scene of the rape), amounted to a “forcible seizing and carrying of [the victim] from one place to another.” In addition, the evidence indicates that the victim was in fear of great bodily harm because the defendant was armed. The evidence satisfies the elements of La. R.S 14:44.1. This assignment of error is without merit.

COUNSELED ASSIGNMENT OF ERROR NUMBER 1 PRO SE ASSIGNMENT OF ERROR NUMBER 1

In the first assignment, the defendant claims he was denied a fair trial because of the State’s: (1) deliberate use of the victim’s perjured testimony in violation of Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); (2) failure to disclose the victim’s felony conviction and *857 warrant from the State of Arkansas in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10|21L.Ed.2d 215 (1963); and (3) the State’s failure to disclose certain advantages the victim received by virtue of the State’s refusal to extradite the victim to Arkansas in answer to a criminal warrant.
The defendant claims that the State knew the victim committed perjury when she testified that she had no reason to give the police a false name.
At trial, the victim admitted to drug and prostitution charges in Mississippi and Louisiana. During cross-examination, defense counsel queried:
Q. And you didn’t give them (the police) your real name, because you thought there was an attachment for you ?
A. Yes.
Q. So what was there an attachment for you for?
A. For this charge and ... for a charge that I did time for already.
Q. So you thought that at that point the police were looking for you?
A. Yes, I did.
Furthermore, during the defendant’s ease in chief, the defense impeached the victim:
Q. You were in New Orleans at this point on 7/1/09. When you were stopped by [the defendant] you were on probation in Arkansas weren’t you or supposed to be?
A. I told you, I told you I thought I had some attachments, but remember when they ran them in, sir, they were not found.
Q. Thought you had attachments?
A. I mentioned that already.
Where a prosecutor allows a state witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness’s testimony reasonably could have affected the jury’s verdict, even if the testimony goes only to the credibility of the witness. Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); State v. Broadway, 96-2659, p. 17 (La.10/19/99), 753 So.2d 801, 814. To prove a Napue claim, the defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony. Broadway, 96-2659, p. 17, 753 So.2d at 814. Furthermore, fundamental fairness, i.e., due process, is offended “when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.” Napue, 360 U.S. at 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217. When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, the grant of a new trial based upon a Napue violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. United States v. O’Keefe, 128 F.3d 885, 893 (5 Cir.1997).
The trial testimony belies the defendant’s claim of a Napue violation. Under direct examination, the victim admitted she gave the police an alias and stated her reason for doing so:
A. ... I went over there by the (police) car like [the defendant] told me, come back and to get my hands on the front of the police car. And they asked me what my name was.
Q. Okay. And did you give them your name ...
A. No.
*858 Q. Okay. Why didn’t you do that ...
A. I don’t know. ■ I was scared to death. I was scared I had — I don’t know. I just gave them a street name.
[[Image here]]
A. I gave [the police] my real name eventually.
| gjThe record does not contain any evidence that the prosecutor acted in collusion with the witness to facilitate false testimony or that the State was aware there was an outstanding warrant for the victim at that time. The defendant ran the victim’s alias and real names the night of the crime but did not discover any warrants.
Neither does the defendant’s contention that the State deliberately lied about the victim’s felony conviction and warrant from Arkansas thereby violating Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), have merit.
Due process requires the disclosure of evidence that is both favorable to the accused and material either to guilt or punishment. Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1197-97. The Brady rule also requires the disclosure of evidence adversely affecting the credibility of government witnesses. See Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). When such information is not disclosed and it is material in that its suppression undermines the confidence in the outcome of the trial, then constitutional error occurs and the conviction must be reversed. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. Materiality hinges on “not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Further, the defendant must show that “ ‘disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.’ ” State v. Marshall, 81-3115, 94-0461 (La.9/5/95), 660 So.2d 819, 826 (quoting Kyles, 514 U.S. at 441, 115 S.Ct. at 1569).
In this case, the State provided the defense with a copy of the victim’s rap sheet or “Triple I,” a report from the Interstate Identification Index. See 42 U.S.C. § 14616. The report indicated that the victim had been arrested in Arkansas by the Faulkner County Sheriff on May 21, 2007, but did not indicate that the victim had any Arkansas convictions. Consequently, the prosecutor was not aware of any convictions in Arkansas. In addition, in light of the victim’s denial of a conviction, the State asserted that there were none. However, during trial, out of the presence of the jury, the defense argued to the trial judge: “It has come to our attention that ... [the victim] ... at this point on the date of her arrest [July 1, 2009] was wanted out of Arkansas on a felony charge she had jumped probation on.” The trial judge accepted proof of the conviction and the State acceded to the fact.
The record does not disclose that the trial judge did not believe that the prosecutor’s actions were suspect or his representations less than candid. The defendant’s claim that the State deliberately lied about the victim’s criminal record and/or attempted to suppress it is without merit as proven by the documents and testimony at trial. The defense was in possession of the victim’s federal rap sheet *859 which indicated that the victim had been arrested in Arkansas. The State’s constitutional obligation to disclose exculpatory evidence does not relieve the defense of its obligation to conduct its own investigation and prepare a defense for trial as the State is not obligated under Brady or its progeny to furnish defendant with information he already has or can obtain with reasonable diligence. State v. Kenner, 2005-1052, p. 2 (La.12/16/05), 917 So.2d 1081, 1081 (citing United States v. Newman, 849 F.2d 156, 161 (5th Cir.1988)). ‘“There is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source, because in such cases there is really nothing for the government to disclose.’ ” State v. Hobley, 98-2460, p. 25 n. 10 (La.12/15/99), 752 So.2d 771, 786 (quoting Coe v. Bell, 161 F.3d 820, 844 (6th Cir.1998)), cert. denied, Hobley v. Louisiana, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000). The defendant had “the essential facts that would enable him to take advantage” of any impeachment material to be gained by virtue of the victim’s conduct in Arkansas.
Furthermore, the jury had ample ground to discredit the defendant’s claims of innocence even without the evidence of the Arkansas conviction. The victim unequivocally identified the defendant as her attacker and the identification was bolstered by proof that the defendant’s name was affixed to his uniform shirt. Moreover, the defendant could not account for his whereabouts during a three-hour time frame during his shift. Testimony from the defendant’s commanding officer proved that the defendant lied when he testified that he turned in his trip sheet at the end of his shift on July 1, 2009.
Finally, the defendant complains that the State failed to reveal that the victim “made a deal with the State to refuse her extradition to Arkansas.” The defendant contends that, “If [the victim] did not get a deal from the State to refuse extradition, she would be back in Arkansas, doing time after the revocation of her probation.”
The defendant argues that his claim of an extradition deal between the State and the victim was discovered only after the verdict in this case. In his pro se |2Rbrief, he bases the claim on a minute entry from the docket master from the Orleans Parish Magistrate Court, Section M-l, Case Number 513456, which read:
07/15/2010 DURELO *
EXTRADITION HEARING IN MAGISTRATE COURT SECTION Ml
RESULT-DA TO REFUSE CHARGE(S)
DEFENDANT REFUSED WARRANT AND DETAINER FROM ARKANSAS.
The defendant’s interpretation of the above indicated minute entry is in error. The entry indicates that Arkansas, not Louisiana, refused extradition. Moreover, Louisiana has no authority to refuse an interstate extradition demand. The source of all extradition law is Article IV, Section 2, Clause 2 of the United States Constitution (Uniform Criminal Extradition Act)[1], which provides:
*860 A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.
18 USC § 3182 further provides:
Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner is to be discharged.
| a7Thus, had Arkansas requested the victim’s extradition, Louisiana would have been compelled by a constitutionally-mandated duty to comply with the request. However, the record shows that Arkansas did not seek to extradite the victim. The defendant’s allegation of a “deal” is without support. This assignment has no merit.

COUNSELED ASSIGNMENT OF ERROR NUMBER 2

In the second assignment of error, the defendant argues the trial court erred in refusing to grant a mistrial under La. C.Cr.P. art. 770 based upon three allegedly impermissible references to the defendant’s right to silence made by the prosecutor and two NOPD officers.
The first remark occurred in the prosecutor’s opening statement, wherein he informed the jury that it would hear that the defendant was “transported to the Public Integrity Bureau where he chose to invoke his right of silence.” The defense lodged an objection, which the trial court sustained. Thereafter, the prosecutor made no further reference to the defendant’s right to silence as he continued with his opening statement.
The second reference the defendant complains of stems from the direct examination of Det. Joseph Lorenzo. Eliciting information about the detective’s participation in this investigation, the prosecutor asked him “... what was your next course of action?” Lorenzo replied: “[0]ffer[ing] Officer Hollins a chance to give a statement. He said that — ”. The trial court sustained the defense objection. The prosecutor then turned to questions concerning other avenues of investigation pursued by Det. Lorenzo.
The third remark came from Sgt. Darryl Watson in response to the prosecutor questioning what Sgt. Watson did “after developing [the defendant] as a _[^suspect?” Sgt. Watson replied “[w]e relocated to his residence, then knocked on the door to bring him in for an interview just to see what, if any, information he would give us voluntarily. By it being a criminal investigation, of course he decided to get a lawyer and not give us any information.” Once again the trial court sustained the defendant’s objection.
In Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that the use for impeachment purposes of a defendant’s *861 silence at the time of arrest, after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment. The rule imposed by Doyle does not apply to pre-arrest statements. Jenkins v. Anderson, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980).
La.C.Cr.P. art. 775 provides that the trial court shall grant a mistrial when prejudicial conduct in or outside of the courtroom makes it impossible for the defendant to obtain a fair trial. “Mistrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La.C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown.” State v. Castleberry, 98-1388, p. 22 (La.4/13/99), 758 So.2d 749, 768 (citations omitted). “The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.” State v. Wessinger, 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183 (citations omitted).
In State v. Smith, 336 So.2d 867 (La.1976), the Louisiana Supreme Court pointed out that La.C.Cr.P. art. 770 does not apply to references |23to a defendant’s post-arrest silence by the prosecutor or by witnesses, but only applies to references to the defendant’s failure to testify at trial. In Smith, the defendant’s motion for mistrial was based upon a comment made by the prosecuting attorney during the direct examination of the arresting officer in an attempt to summarize the officer’s testimony. The prosecutor stated that the defendant had refused to give a statement when he was under custodial arrest. The Supreme Court held the trial court did not abuse its discretion in denying the motion for mistrial, finding that the reference by the prosecutor was incidental and inadvertent, and nothing indicated the State deliberately intended to inject or exploit the issue.
Pursuant to La.C.Cr.P. art. 771, the trial court has the discretion to grant a mistrial or simply admonish the jury, upon the request of the defendant, where the prosecutor or a witness makes a reference to a defendant’s post-arrest silence. However, a brief reference to a defendant’s post-arrest silence does not mandate a mistrial or reversal when the trial as a whole was fairly conducted; the proof of guilt is strong; and the prosecution made no use of the silence for impeachment purposes. State v. Valentine, 2005-0223, pp. 12-13 (La.App. 4 Cir. 4/5/06), 929 So.2d 779, 787, citing State v. Ledesma, 01-1413 (La.App. 5 Cir. 4/30/02), 817 So.2d 390.
In State v. Price, 2002-0360 (La.App. 4 Cir. 4/2/03), 842 So.2d 491, the defendant argued that the trial court erred in denying his motion for mistrial, made after the prosecutor referred in his opening statement to the defendant’s having surrendered with a letter from his attorney advising authorities that he had an attorney, that they were not to talk to the defendant or ask him anything, and asserting that this was the defendant’s right to remain silent. The State submitted in its brief on appeal that the remark was directed to showing the circumstances of the defendant’s arrest, not to exploit his choice to remain silent at the time of his arrest. IsoThis court found no reversible error, relying on the decision by the Louisiana Supreme Court in State v. George, 95-0110 (La.10/16/95), 661 So.2d 975.
In George, the trial court denied the defendant’s motion for a mistrial, made after the prosecutor asked a detective whether the defendant had made any statements after being advised of his right to remain silent, and the detective replied *862 no. The State maintained that the line of questioning was an attempt to summarize the extent of the investigation, not to exploit the defendant’s failure to claim his innocence after his arrest in an effort to impeach his testimony or attack his defense. The court, citing Doyle, supra, stated:
[i]n this case, the trial judge’s admonition made the prosecutor’s remarks too obvious to miss, and invited the jurors to wonder why the defendant did not offer his alibi defense to the police at the time of his arrest. Nevertheless, in brief, counsel does not dispute the state’s claim that it did not affirmatively exploit the testimony to impeach the defendant’s exculpatory account offered at trial. In the absence of that affirmative misconduct by the state, reasonable jurors may have understood the testimony in the way that the first circuit took the remarks, as a description of how the police investigation culminated in the formal arrest of the defendant with the routine incidents of custody, e.g., the reading of Miranda warnings to the person arrested. Accordingly, we find this assignment does not present reversible error.
95-0110, pp. 9-10, 661 So.2d at 980.
In State v. Olivieri, 03-563 (La.App. 5 Cir. 10/28/03), 860 So.2d 207, the defendant challenged the comment made by the State in its opening statement referencing defendant’s post-arrest silence. Specifically, the prosecutor commented, “[a]nd then when Agent Riker asked him about the rapes, the defendant decided he didn’t want to talk anymore.” The Fifth Circuit found the comment did not warrant reversal of the defendant’s conviction.
In this case, the prosecutor’s remark, as in Price, supra, was not intended to exploit defendant’s assertion of his right to remain silent or for the purpose of calling the jury’s attention to it nor to ascribe a guilty meaning to his silence. See, State v. Kersey, 406 So.2d 555, 560 (La.1981). As in George, supra, reasonable jurors may have understood the prosecutor’s remark simply as a description of the police investigation culminating in the formal arrest of the defendant. Moreover, defense counsel objected to the comments without stating the nature of the objection or requesting an admonition. Hence, the jury’s attention was not diverted to the issue of the defendant’s post-arrest silence. Nothing indicates the State deliberately intended to exploit the defendant’s post-arrest silence. The State made no further mention of the defendant’s post-arrest silence during the testimony of other state witnesses or in closing argument. Furthermore, the defendant never articulated any prejudice sustained by him due to the remarks.
As for the state’s witnesses, Det. Lorenzo made no reference to the defendant’s silence. In fact, Det. Lorenzo’s response to the prosecutor’s question about what he did after speaking with another witness was “we offered [the defendant] a chance to give a statement. He said that ...” The defense objected, without articulating a reason, effectively barring any qualification of Det. Lorenzo’s answer and, at the same time, preventing further questioning in that area.
Sgt. Watson’s testimony, like Det. Lorenzo’s, was interrupted by the defense objecting without giving a reason. Unlike Det. Lorenzo, however, Sgt. Watson did reference the defendant’s silence by indicating that the defendant refused to voluntarily give a statement to the police by “deciding] to get a lawyer....” After the objection, the prosecutor continued on the intended line of questioning |S2with: “Sergeant, who accompanied you to Mr. Hol-lins’ house?” It is apparent that both Det. Lorenzo and Sgt. Watson were referring *863 to the defendant’s pre-Miranda silence, to which the rule imposed by Doyle does not apply. See Jenkins, supra. The trial judge did not consider Sgt. Watson’s remark prejudicial and did not admonish the jury. The defense has not shown how it was prejudiced by Sgt. Watson’s testimony. “The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.” State v. Wessinger, 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183 (citations omitted).
The trial court did not abuse its discretion in denying the request for mistrial. Under the circumstances of this case, a mistrial was not warranted. This assignment is without merit.

PRO SE ASSIGNMENT OF ERROR NUMBER 2

In this assignment, the defendant pro se argues that his due process rights were violated because “the trial court failed to give a jury charge as to the law applicable to the case.”
La.C.Cr.P. art. 801(C) states that a party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection is made before the jury retires or within such time as the court may reasonably cure the alleged error. Thus, a defendant must make a timely objection under La.C.Cr.P. art. 801 in order to preserve a jury charge issue for review. The record in this case indicates the parties made no objections during the jury instructions. Defendant’s failure to object to the jury charges precludes appellate review of any issue relating thereto.
laaThis assignment is meritless.

COUNSELED ASSIGNMENT OF ERROR NUMBER 3

In a third assignment of error, the defendant complains of the State’s “improper use of other bad acts evidence.” The defendant objects to the evidence concerning violations of police policies and procedures, evidence relative to sex-related objects in his police car, as well as his relationship with his wife and girlfriend. However, the defendant did not object to the foregoing issues. Nor did he request an admonition to the jury or a mistrial. In the absence of objection, the defendant is precluded from raising the foregoing issues on appeal. La.C.Cr.P. art. 841. However, the defendant did object to the admission of the testimony of KC concerning other crimes evidence pursuant to La. C.E. art. 412.2.
Generally, a court may not admit evidence of other crimes to show a defendant is a man of bad character who has acted in conformity with his bad character. La. C.E. art. 404; State v. Brown, 2003-1616, p. 11 (La.App. 4 Cir. 3/31/04), 871 So.2d 1240, 1247, citing State v. Taylor, 2001-1638, p. 10 (La.1/14/03), 838 So.2d 729, 741-42. The State may, however, introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason for admissibility, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1); State v. Rose, 2006-0402, p. 12 (La.2/22/07), 949 So.2d 1236, 1243.
A trial court’s ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Cosey, 97-2020, p. 13 (La.11/28/00), 779 So.2d 675, 684. The introduction of inadmissible other crimes evidence results in a trial error subject to harmless error analysis on appeal. State *864 v. Parker, 42,311 (La.App. 2 Cir. 8/15/07), 963 So.2d 497.
la/The Louisiana Supreme Court adopted the federal test for harmless error announced in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as a practical guide for determining whether substantial rights of the accused have been violated. See State v. Gibson, 391 So.2d 421 (La.1980). Chapman tests whether it appears “beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.” 386 U.S. at 24, 87 S.Ct. at 828. An error did not “contribute” to the verdict when the erroneous trial feature is unimportant in relation to everything else the jury considered on the issue.
Chapman was refined in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The Sullivan inquiry “is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.” Id., 508 U.S. at 279, 113 S.Ct. at 2081. The Louisiana Supreme Court adopted the Sullivan refinement of Chapman. See State v.Code, 627 So.2d 1373 (La.1993).
The defendant argues that “La. C.E. art. 412.2 allows for the introduction of evidence of similar crimes in cases involving sex offenses under certain circumstances, including the safeguards of La. C.E. arts. 403 and 404(B).” Moreover, the defendant maintains “that since [the victim] was an adult, evidence of lustful disposition was not admissible,” and further suggests that “Louisiana Code of Evidence Article 1103 specifically states that the prior law on the | ^inadmissibility, and the notice requirements of this type of evidence, is not overruled.” [2]
The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the accused committed the charged crime because he has committed other such crimes in the past. See State v. Williams, 09-48, p. 9 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 363. The Louisiana Supreme Court first recognized a “lustful disposition” exception to the general rules of evidence in State v. Cupit, 189 La. 509, 179 So. 837 (1938). In 2001, the legislature codified this lustful disposition exception in La. C.E. art. 412.2, which governs the admission of evidence of similar crimes, wrongs, or acts in sex offense cases and provides, in pertinent part, the following:
A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
B. In a case in which the state intends to offer evidence under the provision of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.[3]
*865 La. C.E. art. 403 provides that, “[a]l-though relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” A trial court’s ruling on the admissibility of | ^evidence is reviewed for an abuse of discretion. This same standard is applied to rulings on the admission of other crimes evidence and evidence under La. C.E. art. 412.2. State v. Wright, 2011-0141, pp. 10-11 (La.12/6/11), 79 So.3d 309, 316.
In Wright, the Supreme Court rejected the defendant’s argument that La. C.E. art. 412.2 only applies when the victim is under the age of seventeen. The court noted that:
[t]he statute specifically applies in two situations: 1) when an accused is charged with a crime involving sexually assaultive behavior, or 2) when an accused is charged with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense.
Id. at p. 11, 79 So.3d at 316.
[[Image here]]
Further, in enacting Article 412.2, the Legislature did not see fit to impose a restriction requiring such evidence to meet a stringent similarity requirement for admissibility. We have previously examined the legislative history behind the Article in State v. Williams, 2002-1030 (La.10/15/02), 830 So.2d 984. In Williams, this Court noted the enactment of the Article was prompted primarily by two decisions of this Court, State v. McArthur, 97-2918 (La.10/20/98), 719 So.2d 1037, and State v. Kennedy, 2000-1554 (La.4/3/01), 803 So.2d 916. Both cases involved prosecutions for aggravated rape in which the State sought to introduce evidence of other sexual offenses committed by the defendants pursuant to what the State labeled a “lustful disposition” exception to other crimes evidence. In both cases, this Court refused to recognize the so-called “lustful disposition” exception to Article 404’s other crimes prohibition, but, in doing so, noted that the evidence sought to be introduced would be admissible if Louisiana had a rule similar to Federal Rule -of Evidence 413. This Court stated “the enactment of Article 412.2 was apparently the legislature’s response to this Court’s statements in McArthur and Kennedy as the language of Article 412.2 closely follows that of Federal Rule of Evidence 413.” Williams, 830 So.2d at 986. Thus, Article 412.2 was enacted to loosen restrictions on “other crimes” evidence, and to allow evidence of “lustful disposition” in cases involving sexual offenses.
Id. at pp. 12-13, 79 So.3d at 316-317.
1 S7The trial court did not abuse its discretion in this case. The sexually assaul-tive behavior related by the victim and the offense reported by KC were similar enough to allow introduction of the evidence pursuant to La. C.E. art. 412.2. Both women were placed in the defendant’s patrol car and driven around the city for a length of time, all while the defendant purposely failed to report his whereabouts and the arrest of the women to be certain there was no report of the women ever being in the defendant’s patrol car. Additionally, the defendant repeatedly asked both women “what she could do for him,” and his behavior resulted in sexual assaults on each woman. This assignment is without merit.

*866
COUNSELED ASSIGNMENT OF ERROR NUMBER 4

In this fourth assignment of error, the defendant claims he was denied a fair trial because of prosecutorial misconduct in the form of pervasive, snide and sarcastic remarks; rude and unprofessional conduct; mischaracterization of and editorializing testimony; arguing facts not in evidence; confusing questions to witnesses; and disrupting and hampering of cross-examination of witnesses. The defendant also advances a claim of ineffective assistance of counsel in this assignment.
La.C.Cr.P. art. 766 confines the scope of the opening statement by the State to the explanation of the nature of the charge and evidence by which the State expects to prove the charge. La. C.Cr.P. art. 774 confines the scope of argument to “evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.” The trial judge has broad discretion in controlling the scope of the opening and closing arguments. State v. Prestridge, 399 So.2d 564, 580 (La.1981). However, even if Lathe prosecutor exceeds these bounds, the court will not reverse a conviction if not “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. See State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, 200.
Louisiana jurisprudence on prosecutorial misconduct suggests that the prosecutor should refrain from making personal attacks on defense strategy and counsel. State v. Brumfield, 96-2667, p. 4 (La.10/20/98), 737 So.2d 660, 663; see also State v. Duplessis, 457 So.2d 604, 609 (La.1984) (prosecutor’s comment that “a bus full of witnesses would not be enough for defense counsel because he was a ‘very skillful lawyer’ ” improper).
In this case, the defendant alleges twelve incidents of prosecutorial misconduct. While the defendant makes references to portions of the record as illustrations of alleged prosecutorial misconduct, a review reveals that the conduct alleged is either not supported by the content of the record or the conduct simply does not constitute misconduct.
Three of the twelve instances cited to by the defendant in his appellate brief: (no. 4) “the ADA telling the defendant that he should ‘get his money back;’ ” (no. 7) “the ADA alleges that if the defendant had done his duty as a police officer and found the Arkansas warrant on the incorrect information he was given by [the victim], nothing would have happened” and (no. 6) “the District Attorney makes public comments about the judge and his rulings in other cases during the middle of this case that result in media stories, including a front page picture. While the jury has been instructed not to read or listen to anything about this case, the jury was not instructed to avoid the media entirely” all occurred while the jury was excused from the courtroom. Hence, the three instances could not have had any influence on the jury.
IsflContinuing, the defendant cites two exchanges (nos. 3 and 8) in which the assistant district attorney called defense counsel “amateur” and “rude and ugly” that occurred during the victim’s testimony:
Defense: And then let’s start with the first lie.
Now you started off—
ADA: Objection to the characterization—
Defense: — he asked you about—
ADA: — of a lie.
Court: Sustained.
ADA: “Let’s start with the first lie.”
*867 Defense: Well, ma’am—
ADA: That’s amateur.
Court: Sustained.
[[Image here]]
Defense: Well, ma’am, if you just took a minute you would see that you testified on May 28, Can you read that? Do you read and write?
Victim: Would you like for me to read this out to the Court and to the jury for you, sir?
Defense: Then read the date on there then.
ADA: Objection. I mean that’s just plain rude. She has been reading throughout the entirety of her testimony.
Court: Sustained.
ADA: That’s just ugly.
Court: [Defense], what’s your question? ADA: He should be ashamed.
Defense: Judge, if you just bear with me, I think I’ll be finished if I can get an answer ...
|4nThe trial judge agreed with the ADA and sustained his objection. The record shows that the defense was amateurish in its manipulation of the victim’s testimony and unnecessarily rude to the victim. The defense was cast in an unfavorable light by its own actions, not by anything the State did.
The sixth alleged incident of prosecuto-rial misconduct cited by the defense: “In making objections, the ADA gives speeches and makes comments. On one occasion, the Court sustains his objection and three times tells him to stop but he continues.” That portion of the transcript reads:
ADA: Your Honor—
Defense: So let me ask you, ma’am—
ADA: Your Honor—
Court: Sustained.
ADA: — he’s not—
Court: Sustained.
ADA: — not allowed to go into—
Court: Sustained.
ADA: And he continues to do so. I would ask for an instruction—
Court: Sustained.
The foregoing portion of trial transcript shows that the defense persisted in a line of questioning thrice objected to by the State and three times sustained by the Court. The defense attempts to fault the State for behavior the defense provoked.
As for ninth incident: “The prosecutor continues to lecture the defense attorney and the Court, resulting in the judge referring to him as the ‘professor.’ ”
141The exchange between the Court, ADA and defense arose from the State’s objection to the defense leading its witness:
ADA: He can’t lead his own witness, specifically the defendant. Who, what, when, where, why, that’s a start.
Court: I believe he can throw “how” in there as well. Thank you, Professor Freeman. What’s your question, [defense counsel]?
The exchange was little more than a good natured barb at the ADA’s expense and certainly not prejudicial to the defendant.
Another instance of misconduct cited by the defense (no. 11): “There were 10-15 ADAs in the court room to watch the ‘show’ of the cross examination of the defendant. They were laughing.” That alleged incident of misconduct unfolded during the State’s cross-examination of the defendant:
Court: All right. Wait a minute. [ADA], I’m going to say this one time: You’ve got a man on trial, possibly facing life, could you direct your office, who *868 sends ten to fifteen DAs to watch the trial, that this is not a place of fun. This is not a place of pleasure. This is not a place to come in and laugh about it. All right, sir?
ADA: Your Honor, I find nothing humorous about this at all.
Court: Well, apparently people in your office do. Where do you think the laughter and chatter is coming from, [ADA]?
ADA: I’m not looking at the audience, sir.
Court: Okay. All right.
ADA: If there’s any—
Court: If you cannot compose yourself, please step out of the courtroom.
ADA: Thank you, Your Honor.
JjjThe trial judge soundly rebuked the errant ADAs by calling them out during the trial. Taking the ADAs to task as the trial judge did placed the District Attorney’s Office in a bad light. Without a doubt, the ADAs’ misconduct was reprehensible, unprofessional and in need of correction; however, the defendant has failed to show how he was prejudiced by the ADAs actions.
The next instance of prosecutorial misconduct (no. 12): “In cross examining the defendant, the ADA testifies about his search on the Internet and alleges that the combinations of vitamins from the trunk are a homemade cure for erectile dysfunction,” was not objected to at the time it was made. Even so, while charging the jury, the trial judge emphasized that evidence came from testimony rendered by witnesses on the stand. He stressed that comments and arguments made by the ADA and defense counsel were just that and should not be given credence by the jury. Further, the defendant’s potency was not an issue at trial, nor did it have any bearing on the defendant’s guilt for the offenses charged.
Another alleged instance of misconduct: “Though the State has the tapes and tape player, the ADA objects to pushing the button to play the tape for the defense during cross,” is simply a petty complaint by the defense. On many occasions, the defense relied upon the State to assist it in marshaling its evidence, retrieving exhibits and operating the mechanical equipment during trial. In fact, the record indicates that the trial judge and the ADA were exasperated at times by the defense’s difficulty in presenting its case. To suggest that the defendant was damaged by the ADA’s reluctance to assist the defense is incredible.
The final instance of alleged misconduct: “The ADA asked the defendant why his attorney did not subpoena NOPD documents, inferring that the defense has [4Sa burden of proof,” did not occur. The ADA did not mention any such thing. Instead, the defense called the jury’s attention to subpoenaing documents:
Defense: The State’s paper gets graded. We have no duty to produce documents. It’s up to the State to produce documents, although we’ve produced a great deal.
Consequently, if there was any doubt about which side bore the burden of proof in this case, it was allayed by the defense. Additionally, the burden of proof was reinforced by the jury charges given by the trial judge.
The record is replete with verbal exchanges between the ADA and defense counsel which certify that they were on less than cordial, professional terms. The defense’s suggestion that the ADA be subjected to professional sanction was met with the ADA’s opinion that the defendant be refunded his legal fees because of defense counsel’s ineptitude. However, none *869 of the instances complained of resulted in prejudice to the defendant or would warrant relief. Furthermore, at all times the trial judge maintained decorum and control over the proceedings and all counsel.
As to the defendant’s claim of ineffective assistance of counsel, ordinarily, an ineffective assistance claim is better addressed in an application for post-conviction relief filed in the trial court in which a full evidentiary hearing can be held. State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient to permit a determination of counsel’s effectiveness at trial, the claims may be addressed on appeal. State v. Wessinger, 98-1234, p. 43 (La.5/28/99), 736 So.2d 162, 195; State v. McGee, 98-1508, p. 4 (La.App. 4 Cir. 3/15/00), 758 So.2d 338, 341. Indeed, when the appellate record is sufficient, “the interests of judicial economy justify consideration of the issues on appeal.” State v. Kanost, 99-1822, p. 6 (La.App. 4 Cir. 3/29/00), 759 So.2d 184, 188. Such is the case here.
The standard for assessing an ineffective assistance of counsel claim is well-settled; the two-prong standard enunciated in the seminal case of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), must be applied. See also State v. Fuller, 454 So.2d 119 (La.1984). In order to prevail, a defendant must establish both that counsel’s performance was deficient and that the deficiency prejudiced the defendant. State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. As to the former, the defendant must show that counsel made errors so serious that counsel was not functioning as the “counsel” the Sixth Amendment guarantees. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, 97-2061, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. As to the latter, the defendant must show that “counsel’s errors were so serious as to deprive him of a fair trial, i.e., a trial whose result is reliable.” McGee, 98-1508 at p. 5, 758 So.2d at 342. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel’s deficient performance the result of the proceeding would have been different; “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
An “effective counsel” has been defined as “not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.” State v. Anderson, 97-2587, p. 7 (La.App. 4 Cir. 11/18/98), 728 So.2d 14, 19 (citing State v. Seiss, 428 So.2d 444 (La.1983)). Given that “opinions may differ on the advisability of a tactic, ^hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” State v. Crowell, 99-2238, p. 8 (La.App. 4 Cir. 11/21/00), 773 So.2d 871, 878 (quoting State v. Brooks, 505 So.2d 714, 724 (La.1987)). It follows then “trial strategy” type errors do not constitute ineffective assistance of counsel. Crowell, 99-2238, at p. 8, 773 So.2d at 878 (citing State v. Bienemy, 483 So.2d 1105 (La.App. 4th Cir.1986)).
A court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. at 2065. There is no precise definition of reasonably effective *870 assistance of counsel, so any inquiry into the effectiveness of counsel must be specific to the facts of the case and must take into consideration the counsel’s perspective at the time. State v. LaCaze, 99-0584, p. 20 (La.1/25/02), 824 So.2d 1063, 1078-79. The Sixth Amendment does not guarantee errorless counsel or counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance. Id.
The defendant in this case contends that his counsel “displayed no knowledge of items that had been provided in discovery, and he took no responsibility for determining what was missing. He did not appear to have examined the evidence, including rap sheets and forensic reports. There was a lot of ‘shooting from the hip’ going on, with very little of a developed theory of the defense.” Further, the defendant argues that counsel “was unprepared to handle any of the other “bad acts” evidence and did not object to any of it.”
14f,Contrary to the defendant’s contentions, defense counsel, a seasoned advocate of impressive credentials and experience, was in fact well aware of the items provided in discovery. He made sure that the State had complied with discovery by comparing copies of documents and reports given him in pre-trial discovery with the items the State sought to introduce at trial. Defense counsel rechecked the identity of evidence during each witness’ testimony. Furthermore, defense counsel corrected the State’s position that the victim had no record in Arkansas by obtaining the victim’s rap sheet.
As for theory of defense, counsel argued to the jury that the defendant did not commit any crime and that the victim was lying. Counsel subjected the victim to withering cross-examination, highlighting her criminal past — drugs, prostitution — to show why her testimony should not be viewed as truthful. Further, defense counsel artfully cross-examined all of the State’s witnesses. Counsel produced the defendant’s wife and girlfriend to explain the presence of the sex paraphernalia confiscated from his patrol car. He highlighted the absence of DNA which would link the defendant to the victim by calling the former director of the NOPD crime lab.
Finally, with regard to counsel being “unprepared to handle any of the other ‘bad acts’ evidence and did not object to any of it” counsel may have chosen not to call attention to that evidence as a matter of trial strategy. “Trial strategy” type errors do not constitute ineffective assistance of counsel. Crowell, 99-2238 at p. 8, 773 So.2d at 878. In short, the defendant has failed to establish that counsel’s performance was deficient and that the deficiency prejudiced him. This assignment is without merit.

COUNSELED ASSIGNMENT OF ERROR NUMBER 6

|47In this assignment, the defendant complains that his sentences for attempted aggravated rape and second-degree kidnapping are excessive.
In State v. Landry, 2003-1671, pp. 7-9 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239-40, this Court set forth the standard for reviewing an excessive sentence claim:
La. Const, art. I, § 20 explicitly prohibits] excessive sentences. State v. Baxley, 94-2982, p. 4 (La.5/22/95), 656 So.2d 973, 977. Although a sentence is within the statutory limits, the sentence may still violate a defendant’s constitutional right against excessive punishment. State v. Francis, 96-2389, pp. 6-7 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront *871 to society. Baxley, supra. A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 676. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 94-2982 at p. 10, 656 So.2d at 979.
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1 and whether the sentence is warranted under the facts established by the record. State v. Trepagnier, 97-2427, p. 11 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 189. If adequate compliance with La. C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Bonicard, 98-0665, p.3 (La.App. 4 Cir. 8/4/99), 752 So.2d 184, 185.
However, in State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, 819 this court stated:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Láñelos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.CrJP. art. 881.4(D).
In State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
On appellate review of sentence, the only relevant question is “ ‘whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.’” State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La.1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const, art. I, § 20, i.e., when it imposes “punishment disproportionate to the offense.” State v. Sepulvado, 367 So.2d 762, 767 (La.1979). Prior to sentencing the defendant in this
case, the trial court noted:
I do not take this particular case, nor do I take any case in this section of court lightly. But now, [defense counsel], because of the status of your client, I have a very special individual who is now convicted. So I’m dealing with special circumstances. We have a member of the New Orleans Police who, in full uniform, with his badge, handcuffs, gun, police cruiser, and a whole litany of items that made up his uniform, to be tried and convicted by citizens herein this particular courtroom, sir. I do not take this case lightly and I’m not going to take anything regarding the sentencing lightly.
One of the major obligations of a police officer, growing up in this city, is *872 that the young kids, the young kids are taught to look up to police officers, admire police officers. And the big thing that we all as citizens look forward to is to trust police |49officers. Police officers share a special role model or act as a special role model to all citizens, especially to young kids, sir. But in this particular case ... a jury of [the defendant’s] peers have spoken. And ... on the issue of the second-degree kidnapping charge, the jury came back with a unanimous twelve to zero decision. I do not take that lightly, sir. All right? We have an individual who the jury was convinced was, for whatever reason, illegally detained, handcuffed, and brought to another location. The officer, in this particular case, showed a type of power and dominance over the victim that he singled out on that day.
... [the defendant] was on duty. [The defendant] was being paid during the time that the jurors said he is now a convicted rapist — I’m sorry — on the charge of attempted aggravated rape and a kidnapper. He was paid during that time. That’s what the jury came back on ... I do not take this lightly, sir.
Let me deal with the kidnapping charge first ... we’re talking about an individual in full uniform who took an oath to protect and to serve. Code of Criminal procedure allows a sentence of no less than five and nor more than 40 years. Because of the special circumstances ... I have no choice but to level the forty years on the charge of kidnapping. I’ll note your objection there, sir.
Let’s move on to the attempted aggravated rape charge. Again, same individual, same police cruiser, same uniform, same badge, same time frame in terms of working on the clock. Then, when we talk about the factor of rape, experts have all said ... that rape is a crime showing power and dominance. There’s nothing more violating to half the population of the City of New Orleans, half the population, sir, than to violate their sanctity. [The defendant] did it while in full uniform. And again, I cannot take that lightly, all right ..., [the defendant] violated the trust of the citizens of New Orleans demand of the New Orleans police. And because both of these matters fall under the legislature’s definition of a crime of violence, I have to treat it as such ... the jury came back with a verdict in this case convicting [the defendant] of attempted aggravated rape. You are correct to say he was not convicted as charged of aggravated rape, but he was found guilty of attempted aggravated rape. And on that charge ... the Court is going to impose a sentence of forty-five years. Those sentences are to run concurrent. We’ll note your objection and let the appellate process begin.
IsnThe defendant herein argues his sentences are excessive in light of his personal history (forty-eight years old, married, with family ties, employed and educated), lack of prior criminal history, and “the facts show that it is one of the least onerous forms of these serious crimes.”
The sentencing transcript shows that the trial judge’s disgust for the defendant’s reprehensible betrayal of the public’s trust and his cruel treatment of the victim. The record belies the defendant’s assertion that “the facts show that it is one of the least onerous forms of these serious crimes.” The defendant premeditated his actions — he preyed upon the defenseless victim because he knew she would not be believed because she was a prostitute and drug addict. He chose a dark and remote area of the city so that his crime would not be discovered, all the while threatening the *873 victim with a gun. He violated the public trust by pretending to be acting under color of law and committing his crimes while on the public payroll.
Other circuits have found forty-five and forty year sentences for attempted aggravated rape and second-degree kidnapping convictions, respectively, not excessive. See State v. Taylor, 41,898 (La.App. 2 Cir. 4/4/07), 954 So.2d 804 (sentence for attempted aggravated rape of fifty years at hard labor without benefit of parole, probation, or suspension of sentence, which was maximum sentence for offense, was not constitutionally excessive); State v. Nelson, 98-2354 (La.App. 1 Cir. 6/25/99), 741 So.2d 877 (forty-five year sentence at hard labor without benefit of probation, parole or suspension of sentence on attempted aggravated rape conviction not excessive); State v. McLelland, 03-498 (La.App. 5 Cir. 10/15/03), 860 So.2d 31 (forty-five year sentence at hard labor for attempted aggravated rape was not unconstitutionally excessive); State v. Pamilton, 43,112 (La.App. 2 Cir. 3/19/08), 979 So.2d 648 (defendant’s sentence of forty years at hard labor, without benefit of parole, probation, or suspension of sentence, for his conviction for second-degree kidnapping, was not excessive); State v. Office, 2007-193 (La.App. 3 Cir. 10/3/07), 967 So.2d 1185 (sentence of forty years at hard labor, without benefit of parole, probation, or suspension of sentence for conviction for second-degree kidnapping, was not excessive).
Based upon the evidence in this case, the sentences were not excessive. This assignment is without merit.

PRO SE ASSIGNMENT OF ERROR NUMBER 4

In a final assignment of error, the defendant maintains that his due process rights were violated by an incomplete appellate record, requiring a reversal of his conviction and sentence. Specifically, the defendant complains that the record is missing the State’s and the defense’s opening statements and closing arguments, jury charges and defense peremptory challenges. However, he has made no showing that he was prejudiced by the missing portions of the record.
A criminal defendant has a right to a complete transcript of the trial proceedings, particularly where appellate counsel was not counsel at trial. State v. Demise, 98-0541, p. 10 (La.4/3/01), 802 So.2d 1224, 1234. La. Const, art. I, § 19 guarantees a defendant a right of appeal “based upon a complete record of all the evidence upon which the judgment is based.” Additionally, La.C.Cr.P. art. 843 provides:
In felony cases ... the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
UgA slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal does not cause reversal of a defendant’s conviction. State v. Draughn, 2005-1825, p. 63 (La.1/17/07), 950 So.2d 583, 625 (upheld conviction where record included testimony of all witnesses); State v. Castleberry, 98-1388 at p. 29, 758 So.2d at 773 (lack of recorded bench conference and transcript of voir dire proceedings held not to be substantial or significant omission from record); State v. Allen, 95-1754 (La.9/5/96), 682 So.2d 713 (upheld conviction where defendant’s arguments relating to voir dire were noted as bench conferences in the record and challenges for cause and the attorney’s argu- *874 merits concerning them were transcribed). Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. State v. Hoffman, 98-3118, p. 49 (La.4/11/00), 768 So.2d 542, 586. An incomplete record, however, may be adequate for appellate review. State v. Draughn, 2005-1825 at p. 63, 950 So.2d at 625; State v. Castleberry, 98-1388 at p. 29, 758 So.2d at 773. A defendant will not be entitled to relief on the basis of an incomplete record absent a showing that he was prejudiced by the missing portions of the record. Id. The determination of whether the omissions are material must be made on a case by case basis. The critical inquiry is whether the defendant’s right to judicial review can be performed or is the record so inadequate that the defendant’s constitutional right to review is prejudiced. State v. Boatner, 2003-0485 (La.12/3/03), 861 So.2d 149 (defendant had shown no prejudice in omissions in the record during a witnesses’ testimony who had not in fact identified exhibits which were never introduced into evidence and in the defendant’s testimony which was not “perfectly” transcribed but was sufficient for review). See also State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473 (which upheld defendant’s conviction despite lack of transcripts of opening statements, closing arguments and jury instructions, due to a lack of showing of prejudice by defendant).
In the instant case, an examination of the record indicates that neither defendant’s appellate counsel nor defendant has pointed out any errors that occurred during opening or closing statements that would necessitate a review of those portions of the record by either defendant or this panel. In fact, the record reveals there was only one objection made by the State during the defense’s opening statement, regarding the defense’s impugning the victim’s character:
[The defendant] saw [the victim] who has an array of convictions, you’ll hear them all, theft, fraud, I’ll let you hear about them when we get here. It’s the same way she can’t remember whether she was handcuffed when she was raped or not.
Moreover, during closing argument, the State and the defense each objected one time, to which the trial judge stated: “This is closing arguments.” It is well-settled that opening statements and closing arguments are not evidence.
As for the jury charges, the record reflects that there were no objections during the jury instructions.
With regard to the issue of the defense’s peremptory exceptions, nothing in the record indicates that the defense exercised any peremptory challenges during voir dire.
Considering the foregoing, the defendant has not shown any prejudice based on the missing portions of the transcript. This assignment is without merit.
DECREE
Accordingly, for the reasons set forth herein, the defendant’s convictions and sentence for the attempted aggravated rape conviction are affirmed. The case 154is remanded for the trial court to determine how many years of the defendant’s second-degree kidnapping sentence should be served without benefit of parole, probation, or suspension of sentence.
AFFIRMED AND REMANDED

. Louisiana is one of forty-six states that adhere to the Uniform Criminal Extradition Act.

. La. C.E. art. 1103 was repealed by Acts 1995, No. 1300, § 2.

. In this case, the State filed a notice of intent to offer evidence of similar crimes, wrongs and/ or acts involving previous sexually as- *865 saultive behavior and/or acts by the defendant on November 16, 2010.