STATE OF LOUISIANA      *      NO. 2019-KA-1077

VERSUS      *

KENTRELL HICKERSON      *      COURT OF APPEAL

     FOURTH CIRCUIT

     *      STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 516-272, SECTION "H"
Honorable Camille Buras, Judge
* * * * * *
**Judge Terri F. Love**
* * * * * *
(Court composed of Judge Terri F. Love, Judge Rosemary Ledet, Judge Sandra
Cabrina Jenkins)

**LEDET, J., CONCURS IN THE RESULT**
**JENKINS, J., CONCURS WITH REASONS**


Leon Cannizzaro
District Attorney
Irena Zajickova
Assistant District Attorney
DISTRICT ATTORNEY'S OFFICE
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

     COUNSEL FOR APPELLEE/STATE OF LOUISIANA

Kevin S. Vogeltanz
The Law Office of Kevin S. Vogeltanz
823 Carroll Street, Suite A2
Mandeville, LA 70448--5126


     COUNSEL FOR DEFENDANT/APPELLANT


         **AFFIRMED IN PART; VACATED IN PART**
         **DECEMBER 30, 2020**

TFL

Mr. Kentrell Hickerson ("Mr. Hickerson") appeals his convictions for conspiracy to commit racketeering (count one) and conspiracy to distribute heroin in furtherance of gang activity (count two).  While we find the evidence sufficient to establish Mr. Hickerson's guilt as to both counts, patent error review reveals the jury's verdict on count one, conspiracy to commit racketeering was non-unanimous.  *Ramos v. Louisiana*, -- U.S.--, 140 S.Ct. 1390, -- L.Ed.2d − (2020) held that non-unanimous jury verdicts for felony convictions are unconstitutional.  Therefore, we vacate Mr. Hickerson's racketeering conviction.  We find the jury's verdict was unanimous as to count two and the evidence is sufficient to support the jury's verdict.  Consequently, we affirm Mr. Hickerson's conviction as to conspiracy to distribute heroin in furtherance of gang activity.  Accordingly, we affirm in part, vacate in part, and remand for further proceedings in line with this opinion.

### *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

In June 2013, resulting from a three-year investigation by the New Orleans Gang Task Force (NOGTF), the State of Louisiana charged Kentrell Hickerson,

1

aka "James Hickerson", aka "Black" ("Mr. Hickerson"), and 19 co-defendants with a range of crimes in furtherance of gang activity in association with a criminal enterprise known as "3NG" in violation of the Louisiana Racketeering Act ("LRA"). Specifically, Mr. Hickerson was charged with conspiracy to commit racketeering (count one), conspiracy to distribute heroin in furtherance of gang activity (count two), and conspiracy to distribute cocaine in furtherance of gang activity (count three). Mr. Hickerson filed several pre-trial motions including a request for notice of prior bad acts evidence pursuant to La. C.E. art. 404(B), which was deemed satisfied by the court. Additionally, Mr. Hickerson filed a motion for unanimous jury verdict, which the trial court denied.

The trial in this case commenced in May 2016, wherein the following facts were adduced.

**NOPD Investigation**

In January or February 2011, former NOPD Detective Evan Cox investigated an open-air drug market operating at the intersection of Second and Prieur Streets. For approximately two months, Detective Cox hid in the attic of an abandoned residence located one and a half blocks from the targeted area. In the course of his investigation, Detective Cox took more than 2,000 photographs documenting street level narcotics distribution and the identity of members of the Third and Galvez Gang ("3NG"), the gang which controlled the flow of narcotics through that neighborhood.

In 2012, Detective Cox was transferred to the Multi-Agency Task Unit, working with members of the FBI, the DEA, and the ATF. By this time, he also learned that Mr. Hickerson was a member of 3NG. Interviews with witnesses and drug users, in conjunction with the use of social media and debriefing of gang

2

members, Detective Cox identified many members and associates of 3NG by their given names and street names. At trial, Detective Cox identified photos and a video entitled "New Orleans Uncut." The video began at Second and Prieur Streets and continued in an apartment in the 3200 block of Second Street, which was used as a narcotics distribution point. Detective Cox identified several individuals in the video including Mr. Hickerson. Detective Cox also identified a "stash spot" from which NOPD recovered several firearms, a bulletproof vest, and narcotics. Detective Cox testified that many of the individuals in the photographs and videos introduced at trial were involved in hand-to-hand street sales of narcotics. He also explained that the two-month surveillance allowed authorities to locate individuals who purchased drugs from various indicted defendants, and learn the scope of narcotics trafficking in the area, as well as the associations between drug sellers. Detective Cox further testified that Mr. Hickerson became a target of the investigation in 2012, after Mr. Hickerson was alleged to have been involved in numerous instances of violence.

**Scope of Mr. Hickerson's Gang Involvement**

At trial, evidence was presented that a murderous turf war existed between rival gangs 3NG and the Front of Town Gang ("FTG")[1] and that Mr. Hickerson began to establish himself as the leader of 3NG.

In September 2002, NOPD responded to a homicide in the 3300 block of Thalia Street. The police found the victim Alexis Williams, aka "Slam" riddled with bullets, facedown with several 9-millimeter casings nearby.

James Davis ("Mr. Davis"), who grew up in the Calliope Housing

---

[1] At trial, witnesses reference two gangs from the Calliope Housing Development, the Front of Town Gang and the Back of Town Gang ("BTG").

Development, testified that he was familiar with the FTG, and had known Slam for several years. He testified to two felony convictions and one open charge. Although no promises were made, Mr. Davis testified that he hoped to receive help with his open charge. Mr. Davis testified that he witnessed the September 2002 shooting of Slam from six to eight feet away. He observed a black truck enter a driveway in the Calliope Housing Development. A black male, dressed in black clothing, exited the truck and shot Slam five or six times. When Slam fell, the shooter stood over him and shot Slam three or four more times. About three days after the shooting, Mr. Davis gave police a recorded statement, in which he identified Mr. Hickerson as the shooter from a photographic lineup.

NOPD Sergeant Brian Elsensohn ("Sgt. Elsensohn") was dispatched to investigate a shooting in the 3300 block of Thalia Street in September 2002. Sgt. Elsensohn observed a red Chevrolet Malibu speeding from the direction of the shooting. He stopped the Malibu approximately one mile from the shooting scene. Dalton Bennett, aka "Rocky", was the driver of the Malibu and Mr. Hickerson was a passenger. Sgt. Elsensohn advised the NOPD Homicide Division that Mr. Hickerson was dressed in black clothing and matched the description of the shooter.

Marchello Jones, aka "Marty" ("Mr. Jones") grew up in the Third and Galvez Street area of Central City. At the time of trial, Mr. Jones was serving a 30-year sentence on drug charges. He had not received any promises in return for his testimony in this case, but stated that he hoped for favorable consideration on his Rule 35 sentencing reduction request.

In the late 1990s, Mr. Jones was a young teenager and sold marijuana in Gert Town. He knew Mr. Hickerson was among 3NG members "street corner

4

hustling." After his release from jail in 2000, he continued his contact with 3NG associates, including Mr. Hickerson. Jones testified that although Mr. Hickerson had a job, he was "corner hustling," selling "nickel" and "dime" bags of drugs. On the day Slam was shot, Mr. Jones went to his aunt's house on Second and Johnson Streets—the heart of 3NG territory—where numerous people had gathered. Mr. Hickerson was among the crowd talking about Slam's murder: "Man, I caught [Slam] slipping. He was sitting under the tree. I stuck him to the tree." The murder of Slam elevated Mr. Hickerson's status in 3NG. Mr. Jones began supplying more drugs to the gangs in addition to supplying Mr. Hickerson guns Mr. Jones obtained from Elliot's Gun Store in exchange for cocaine until Mr. Jones' return to jail in 2005.

Mr. Jones returned to New Orleans in 2007. Mr. Jones testified that despite a downturn in drug sales in the uptown market following Hurricane Katrina, Mr. Jones was unaffected by the scarcity because he had a heroin and cocaine supplier in Houma and was able to supply heroin to Mr. Hickerson and others.

Rico Jackson, aka "Freaky," testified that he was in federal custody on the 3NG indictment, and the State previously charged him in this case. He admitted he was responsible for several murders for which he was never charged. He also identified the global plea agreement he entered to resolve his state and federal charges. While he admitted he had not received any promises from the state or federal government, he "hope[d] to get a chance to be free again."

Mr. Jackson admitted he was a member of 3NG and knew that Mr. Hickerson was also a member of the gang. He testified that as a member of 3NG, he received protection from violence, rival gangs, and the police. Mr. Jackson stated that he began selling heroin in 2000. In the time he sold heroin, Mr. Jackson

5

stated that he observed Mr. Hickerson selling "dope" on the streets. Mr. Jackson also testified that Mr. Hickerson told him that he killed Slam. He stated that Slam's death benefitted 3NG gang members because they no longer had to worry that Slam was going to kill them.

On cross-examination, Mr. Jackson indicated that he could only give his word that Mr. Hickerson committed the offenses to which Mr. Jackson testified. Mr. Jackson indicated he had no other evidence to support his testimony. He stated that he witnessed Mr. Hickerson sell drugs on several occasions. Mr. Jackson further noted that 3NG was not just a group of friends who grew up together selling drugs but was in fact a gang. Finally, Mr. Jackson testified that people in the neighborhood knew Mr. Hickerson was a member of 3NG and not someone to be "messed with."

Washington McCaskill ("Mr. McCaskill") also testified that he had known Mr. Hickerson since 1999, and 3NG was "a statement in the streets of respect," meaning "you're going to roll with us or get rolled over." Mr. McCaskill stated that Mr. Hickerson "called the shots," that Mr. Hickerson was the "top of the food chain" and rose to that position by killing people. At trial, McCaskill recounted the day Slam was killed. Mr. McCaskill testified that before Slam was shot, Mr. Hickerson led a meeting with 3NG members wherein it was decided to target Slam. Mr. McCaskill and Dalton Bennett were part of the discussion. Dalton Bennett and Mr. Hickerson left the discussion and traveled to the "Front of Town" area in a blue truck. Eventually, Mr. McCaskill saw the blue truck drive past, after which Mr. Hickerson later returned to Third and Galvez. Mr. Hickerson admitted to Mr. McCaskill that he and Dalton Bennett killed Slam. Mr. Hickerson grabbed Slam by his dreadlocks, stuck a gun in his face, stood over him and shot Slam to

death. Mr. Hickerson explained to Mr. McCaskill that he was later stopped by the police and that he disposed of the murder weapon in the housing development. Mr. McCaskill testified that Slam's murder increased respect for 3NG because Slam had instigated violence against 3NG members. Mr. McCaskill also testified that Mr. Hickerson supplied Mr. McCaskill with heroin to sell while Mr. Hickerson worked his day job. Mr. McCaskill indicated that the two would split the money made from the drug sales.

Ramona Cole, Slam's cousin, also testified at trial. She stated that she grew up in the Calliope Housing Development and identified Mr. Hickerson as a member of 3NG. Ms. Cole recalled that in March 2005, she attended a party at June's Bar on Fourth and Dryades Streets. Ms. Cole stated that after her friend Albert Williams, aka "Sugar Man" was killed, friends gathered at June's Bar to console each other. Several members of 3NG entered the bar. Some of the members were armed and one wore a shirt with the words "RIP Sugar B****" printed on it. When patrons noticed the guns, chaos erupted and everyone ran. While no one was shot, police were called. Appearing to find it difficult to testify at trial, the prosecutor asked Ms. Cole as she sat in the witness stand if she was able to look at Mr. Hickerson. She responded that she did not want to because "[h]e's just evil."

Detective Carlton Lawless testified that in March 2005, he was dispatched to June's Bar in response to complaints of numerous, heavily armed individuals who entered the bar and threatened to shoot people. Detective Lawless testified that he pursued three males and caught them behind 2717 Dryades Street. Mr. Hickerson was among the detainees. All three men were arrested for disturbing the peace.

Sergeant Wayne DeLarge also testified that he responded to a call for

7

assistance at June's Bar in March 2005. When he arrived several frantic women directed Sgt. DeLarge and his partner to three black males on Fourth Street, who the women said, were heavily armed. Sgt. DeLarge located the three men on Fourth Street. The three suspects discarded their weapons and fled on foot. With the help of a canine unit, officers apprehended them and confiscated their weapons. Mr. Hickerson was among the men apprehended.

Ashley Brooks testified that she grew up in the Sixth District of New Orleans. She stated that she dated Durrell Pooler, aka "Duke," who was associated with 3NG and sold crack cocaine in 2007 and 2008. Ms. Brooks identified Mr. Hickerson in court and admitted she had a federal conviction for discharging a firearm in furtherance of drug trafficking. She cooperated with the government and received a 90-month sentence. She denied being promised a reduction, and she said such relief was subject to the discretion of the federal judge.

At trial, Ms. Brooks related that Pooler called her in June 2008 asking her for a ride. She drove to First Street where she observed several of Pooler's associates selling drugs. While Ms. Brooks waited in her car for Pooler, she saw Mr. Hickerson approach the group selling drugs. She then heard gunshots, and saw Mr. Hickerson shoot Alvin Wilson and then flee the area in a dark-colored car.

Andrew Boyd, aka "Droopy", testified that he grew up in the Calliope Housing Development and knew Wilson for many years. He also knew that Wilson and Pooler were friends. At trial, Boyd testified that he was washing his car near the scene where Wilson was shot and noted several people were present when the murder occurred. He recalled seeing Mr. Hickerson and "T-Red" drive-up. Mr. Hickerson exited his vehicle, spoke to T-Red, and then walked across the street and shot Wilson. Everyone fled the area; however, Boyd stayed to help

Wilson and spoke to police when they arrived.

Shortly after the shooting, Ms. Brooks saw Mr. Hickerson again, this time at the gas station at the intersection of Esplanade and Claiborne Avenues. Mr. Hickerson approached her vehicle and said: "Somebody told me Duke was in this car." At the same time, Mr. Hickerson pointed a gun in her car as he looked around for Pooler. She immediately informed Pooler of the incident.

Tyrone Knockum, aka "T-Bone," testified that he was serving a life sentence for murder in furtherance of racketeering activity. He admitted he hoped his testimony and cooperation would eventually allow his release from incarceration. Knockum testified that he grew up around Second and Prieur Streets and had known Mr. Hickerson his entire life. He stated that he and Mr. Hickerson sold drugs together. Knockum began selling drugs in 2007 and learned how to sell by observing Mr. Hickerson and other 3NG members. Knockum revealed that Mr. Hickerson was the main supplier of heroin to street level sellers in the neighborhood.

The day Pooler was killed, Knockum and a couple 3NG associates were congregating around First and Johnson Streets. They later met up with Mr. Hickerson and two other men. Mr. Hickerson received a telephone call that Pooler was downtown. Mr. Hickerson told Knockum to "go get the gat," an assault rifle stashed in an abandoned house on Johnson Street. Knockum returned with the weapon, and Mr. Hickerson told Knockum and the others to follow him in a car. Knockum and two others rode in a Nissan Altima, while Mr. Hickerson got into another car with a 3NG associate and an unknown driver. Knockum, and the two men riding with him, followed Mr. Hickerson's vehicle to St. Ann Street and parked nearby. Shortly thereafter, Knockum heard gunshots. After the shooting

9

stopped, Mr. Hickerson and the others relocated to Claiborne and Orleans Avenues and then back uptown where Knockum returned the assault rifle to the stash place. While Knockum was with Mr. Hickerson, the report of Pooler's murder came on the news. Mr. Hickerson said: "Man, I think I may have knocked all his "f------ face off."

Knockum's testimony at trial then turned to the March 2009 murder of Omar Breaux. Knockum was on First and Prieur Streets when he received a call from Mr. Hickerson asking him to come to the Popeye's Restaurant on St. Charles Avenue because Breaux was there. Knockum armed himself with an assault rifle and relocated to Popeye's. Knockum waited for Breaux to exit the restaurant and then followed Breaux's car until Knockum had to stop for a red light. Knockum called Mr. Hickerson to tell him what happened. Mr. Hickerson then informed Knockum that he was following Breaux. Knockum went back to the neighborhood. Mr. Hickerson eventually arrived and warned Knockum and the others not to be standing on the street because there could be shooting in retaliation for Breaux's murder.

On cross-examination, Knockum said that his global plea agreement provided that he would receive a 20-year sentence in state court and sentencing at the judge's discretion in federal court. Knockum testified that 3NG was a gang and still operating, and that people who did not grow up in 3NG area were not welcome. Knockum described Mr. Hickerson as "king" of the gang, who acquired that status by "killing people and making a name for himself." According to Knockum, 3NG members protected each other and their turf from outsiders, thereby increasing narcotics sales and profits.

Lieutenant Nicholas Gernon testified that in March 2009, he investigated a

10

shooting near the intersection of South Claiborne Avenue and Earhart Boulevard. The two and one-half block-shooting scene was littered with 9-millimeter and .40 caliber bullet casings. There was a bullet-riddled white Lexus SUV flipped on its side with the deceased victim Omar Breaux pinned underneath the vehicle. Across the street from the SUV was a second victim, Jamal Baisley, who was shot in his lower extremities. The day after the shooting, Lt. Gernon located video surveillance from the Home Depot depicting the victim's and suspect's vehicles traveling side by side on Earhardt Boulevard. Lt. Gernon did not locate any witnesses who would identify the shooter(s); nevertheless, Lt. Gernon developed Mr. Hickerson and Roderick Bennett as suspects. Further investigation led police to believe the shooting was gang-related between FTG and BTG from the Calliope Housing Development and 3NG.

Meredith Acosta, an expert firearms analyst, examined spent bullet casings collected from the scene where Breaux was shot. Ms. Acosta identified the report she authored on her findings. She determined that three weapons were used in the Breaux homicide, including: one 9-millimeter firearm and two .40 caliber weapons. When Ms. Acosta submitted her findings to the National Integrated Ballistics Information Network (NIBIN), the weapons used in the Breaux murder proved a match to the weapons used in two other murders.

Following the 11-day trial, the jury found Mr. Hickerson guilty as charged on counts one (conspiracy to commit racketeering) and two (conspiracy to distribute heroin in furtherance of gang activity), and not guilty on count three (conspiracy to distribute cocaine in furtherance of gang activity). The jury verdict as to count one was 11-1 and unanimous as to count two.

**Post-Trial Procedural History**

Mr. Hickerson filed a motion for new trial, which the trial court denied. The State filed a multiple bill charging Mr. Hickerson as a third felony offender. In July 2016, Mr. Hickerson pled guilty to the multiple bill. The trial court then vacated the original sentence and imposed a sentence of 100 years in the custody of the Department of Corrections on count one, and 100 years in the custody of the Department of Corrections on count two, with a consecutive 25-year suspended sentence for the gang enhancement as to count two.

While Mr. Hickerson's appeal was pending, in July 2016, Mr. Hickerson filed a second motion for new trial based on newly discovered evidence. This Court dismissed the appeal in October 2017, pending the trial court's ruling on the second motion for new trial. The trial court denied the motion for new trial in July 2019. Mr. Hickerson timely filed the instant appeal.

*ERROR PATENT REVIEW*

This Court routinely reviews the record on appeal for errors patent. La. C.Cr.P. art. 920. A review for errors on the face of the record reveals one. Mr. Hickerson's conviction for violation of the Louisiana Racketeering Act (count 1) by a non-unanimous jury verdict of eleven-to-one is unconstitutional.

During the pendency of this appeal, the United States Supreme Court announced a new constitutional rule in *Ramos v. Louisiana*, *supra*. The U.S. Supreme Court held that non-unanimous jury verdicts for felony convictions are unconstitutional. In that Mr. Hickerson's case was pending on direct review when *Ramos* was decided, the U.S. Supreme Court's decision is applicable to this case. *Schriro v. Summerlin*, 542 U.S. 348, 351, 124 S.Ct. 2519, 2522, 159 L.Ed. 442 (2004) (observing that "[w]hen a decision of the [United States Supreme Court]

12

results in a 'new rule,' that rule applies to all criminal cases still pending on direct review").

The State's brief argues that Mr. Hickerson did not sufficiently preserve the issue for appellate review. However, since the State submitted its brief to this Court, the Louisiana Supreme Court issued numerous *per curiam* opinions directing, in pertinent part:

> …The matter is remanded to the court of appeal for further proceedings and to conduct a new error patent review in light of [*Ramos*]…If the non-unanimous jury claim was not preserved for review in the trial court or was abandoned during any stage of the proceedings, the court of appeal should nonetheless consider the issue as part of its error patent review. *See* La. C.Cr.P. art. 920(2).

*See, e.g., State v. Monroe,* 20-00335, p. 1 (La. 6/3/20) ___ So.3d ___. Accordingly, the sufficiency of the defendant's objection(s) to the verdict is immaterial.

*Ramos* requires this Court to vacate the conviction for racketeering. However, we find no basis for Mr. Hickerson's contention that this Court must also vacate his conviction for conspiracy to distribute heroin. Mr. Hickerson argues that if the jury was forced to continue to deliberate, "it cannot be said" that the jury may have eventually rendered a non-unanimous verdict as to both charges.

We find whether the jury's verdict would have been different if it was forced to continue to deliberate is speculative at best. Nothing in *Ramos* suggests that a reviewing court must overturn a unanimous verdict if the jury verdict on the other count was non-unanimous. Because the jury verdict on the conspiracy to distribute heroin was unanimous there is no error or corrective action required.

Based on the foregoing, *Ramos* requires this Court to vacate as unconstitutional Mr. Hickerson's racketeering conviction by non-unanimous

13

verdict.[2]

## *SUFFICIENCY OF THE EVIDENCE*

Although a non-unanimous jury convicted Mr. Hickerson of racketeering, which requires reversal pursuant to *Ramos*, we review Mr. Hickerson's claim of insufficiency of the evidence on said charge in accordance with *State v. Hunter*, 19-0901 (La. App. 4 Cir. 5/27/20), -- So.3d --, 2020 WL 2751914. In *Hunter*, addressed a defendant's assigned error of insufficient evidence before it addressed the assignment of error regarding the constitutionality of the non-unanimous verdict explaining:

> … As the Louisiana Supreme Court has explained, "[t]he reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). Such an acquittal would necessarily prevent any retrial. *See State v. Gaines*, 96-1850, p. 4 (La. App. 4 Cir. 1/29/97), 688 So.2d 679, 682 (observing that "[a]lthough [the defendant's] conviction must be reversed on other grounds, the issue of sufficiency of evidence must be addressed" because "if there was insufficient evidence even in the face of an error so prejudicial as to warrant a new trial, then there can be no new trial"). Thus, the Louisiana Supreme Court has held that an appellate court's failure to address the sufficiency of the evidence, when raised, is error. *See State v. Morris*, 615 So.2d 327, 328 (La. 1993) (observing that "the court of appeal erred in pretermitting relator's contention that the evidence was insufficient to prove the validity of [his] earlier convictions, which [were] an essential element of the charged crime").

*Id.*, 19-0901, p. 1, -- So.3d at -- n. 2.

Mr. Hickerson contends the evidence is insufficient to support his convictions for conspiracy to commit racketeering and conspiracy to distribute heroin. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence."

---

[2] Mr. Hickerson assigns as error the trial court's denial of his pre-trial and post-trial motion to require unanimous jury verdicts. In that we find Mr. Hickerson's conviction for racketeering in count one must be vacated, this assignment of error is rendered moot.

14

*State v. Smith*, 600 So.2d 1319, 1324 (La. 1992). In *State v. Brown*, 12-0626, p. 6-8 (La. App. 4 Cir. 4/10/13), 115 So.3d 564, 570-71, this Court explained:

> The reviewing court must consider the record as a whole. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
>
> ***
>
> When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Shapiro*, 431 So.2d 372 (La. 1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from the *Jackson* reasonable doubt standard; rather, it is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. *State v. Wright*, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the *Jackson* reasonable doubt standard. *State v. Jacobs*, 504 So.2d 817 (La. 1987).

**Racketeering**

Mr. Hickerson was convicted, under La. R.S. 15:1353(D), of conspiring to violate the Louisiana Racketeering Act ("LRA"), specifically, La. R.S. 15:1353(C), which makes it a crime to conduct or participate in an enterprise through a pattern of racketeering. La. R.S. 15:1353 provides:

> A. It is unlawful for any person who has knowingly received any proceeds derived, directly or indirectly, from a pattern of racketeering activity to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in immovable property or in the establishment or operation of any enterprise.
>
> B. It is unlawful for any person, through a pattern of racketeering activity, knowingly to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or immovable property.

C.     It is unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

D.     It is unlawful for any person to conspire or attempt to violate any of the provisions of Subsections A, B, or C of this Section.

Proof of conspiracy may be by direct or circumstantial evidence. *State v. Johnson*, 438 So.2d 1091, 1099 (La. 1983). Pursuant to La. R.S. 15:1352(C), "a pattern of racketeering activity" means engaging in at least two incidents of racketeering activity having the same intent, results, principals, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics. To prove a pattern of racketeering in this case, the State enumerated five overt acts committed by Mr. Hickerson, including: possession with the intent to distribute marijuana; discussion of the criminal activity of the enterprise with co-conspirators; conspiracy to file a false public record; and the murders of Omar Breaux and Durrell Pooler.

Several of the State's witnesses testified they were members of the 3NG for many years. The State produced video and audio evidence of 3NG members pledging loyalty to the one another. The 3NG frequented and protected certain neighborhoods and members banded together to protect themselves from rival gangs. The 3NG held meetings to discuss gang business and discipline wayward members. 3NG members readily admitted that they shared weapons, ammunition, narcotics and proceeds from the sale of drugs.

The State's witness Tyrone Knockum testified that 3NG was a gang and had existed for several years. Further, Knockum testified that he and Mr. Hickerson sold narcotics on First and Prieur Streets, and that Knockum procured drugs from Mr. Hickerson in 2007 to make street sales.

Rico Jackson described the gang's illegal activities, hierarchy and Mr. Hickerson's ascent to leadership of the group. Jackson identified himself and Mr. Hickerson as members of 3NG, who regularly participated in supplying and selling drugs to other 3NG members. In addition, Jackson recounted that Mr. Hickerson would recruit other gang members to sell narcotics for him while Mr. Hickerson worked his day job. Jackson maintained that his association with 3NG provided him with street credibility, respect, and protection from rival gang members.

Washington McCaskill described Mr. Hickerson as at the "top of the food chain" as far as leadership of 3NG was concerned. McCaskill said he and Mr. Hickerson sold drugs together on Third and Galvez. Mr. Hickerson would give McCaskill drugs to sell for him, and the two would split the proceeds.

Brandon Morgan testified that he and Mr. Hickerson sold heroin together on Third and Galvez. Morgan also referred to Mr. Hickerson as the "Big Homie" of the 3NG. Mr. Hickerson told Morgan that "Lil Alvin" was Mr. Hickerson's "flunky" and that when Mr. Hickerson could not be on the street selling heroin, "Lil Alvin" sold for him.

In this case, the State proved that 3NG had multiple purposes, many members, and that it existed at least since 2007. Thus, 3NG was an enterprise for purposes of the LRA. *See* La. R.S. 15:1352(B).

Additionally, Tyrone Knockum's testimony supported the State's charge that Mr. Hickerson murdered Pooler and Breaux. Knockum testified that prior to Pooler's shooting, he supplied Mr. Hickerson with a .223 rifle and accompanied Mr. Hickerson to the site where the shooting occurred. Detective Harbin testified that police .223 caliber casings near Pooler's body, corroborating Knockum's testimony about the type of gun he provided Mr. Hickerson to shoot Pooler.

17

As for Breaux's murder, Knockum recalled that Mr. Hickerson called and told him to "get the gat" and relocate to the Popeye's on St. Charles Avenue to assist Mr. Hickerson in the killing of Breaux.

Ashley Brooks corroborated Knockum's testimony. Ms. Brooks said that the defendant pointed a gun in her car in search of Pooler. Moreover, the two guns used in Breaux's murder were used in the shooting of "Magnolia Shorty," which was attributed to 3NG.

On appeal, Mr. Hickerson avers that Knockum's testimony is unreliable and is insufficient to establish that he murdered Durrell Pooler and Omar Breaux.

"Conflicting statements as to factual matters is a question that goes to the weight of the evidence, not sufficiency." *State v. Jones*, 537 So.2d 1244, 1249 (La. App. 4th Cir. 1989). Such decisions rest solely with the jurors who, as triers of fact, may accept or reject, in whole or in part, the testimony of any witness. *Id.* A juror's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. *Id.*; *State v. Vessell*, 450 So.2d 938, 943 (La. 1984).

In *State v. Wells*, 10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306, this Court stated that "[t]he testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness's testimony, if believed by the fact finder, is sufficient to support a factual conclusion. *State v. Legrand*, 02-1462, p. 5 (La. 12/3/03), 864 So.2d 89, 94. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." *Smith*, 600 So.2d at 1324.

"[T]he *Jackson* standard does not provide a reviewing court with a vehicle for substituting its appreciation of what the evidence has or has not proved for that of the fact finder." *State v. Mack*, 13-1311, p. 9-10 (La. 5/7/14), 144 So.3d 983, 989. A reviewing court may impinge on the "fact finder's discretion ... only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La. 1988).

The record supports a finding that the State presented constitutionally sufficient evidence to sustain the racketeering conviction. Even so, as discussed above, because the jury returned a non-unanimous verdict on the count, this Court is required to vacate that conviction in accordance with *Ramos*.

**Conspiracy to Distribute Heroin**

Mr. Hickerson also claims that the State failed to prove beyond a reasonable doubt that Mr. Hickerson conspired to distribute heroin. La. R.S. 14:26(A) provides:

> Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.

We find the State's evidence was sufficient to support Mr. Hickerson's conviction for conspiracy to distribute heroin. As set forth above, the State introduced evidence that Mr. Hickerson supplied McCaskill with heroin to sell while Mr. Hickerson worked his day job and that the two would split the money made on the sales. Rico Jackson also identified Mr. Hickerson as regularly supplying drugs to other 3NG members. Marchello Jones testified that he supplied heroin (presumably for resale) to Mr. Hickerson from his source in Houma. Based

19

on this evidence, we find the jury could rationally have found that Mr. Hickerson conspired with others to distribute heroin.

## BAD CHARACTER EVIDENCE

In another assigned error, Mr. Hickerson asserts that the trial court abused its discretion when it permitted Ramona Cole to testify that Mr. Hickerson was "evil." Mr. Hickerson maintains that the State called Ms. Cole for the "sole purpose" of eliciting testimony of Mr. Hickerson's bad character. He also complains that the trial court erred when it admitted evidence that he committed four murders. In a separate assigned error, which he does not independently address in the argument portion of his brief, Mr. Hickerson avers that the trial court should not have allowed the presentation of evidence of how he brandished a weapon and menaced patrons at June's Bar.

The State called Ms. Cole to testify about an incident at June's Bar at Fourth and Dryades Streets on the night of March 21, 2005. During direct examination, the following exchange occurred:

> Q. Do you remember how long . . . the guys from "3NG" [were present at the bar that night . . .]?
> A. No.
> Q. I have to ask you a very --- I have to ask you a very tough question. I'm not questioning your credibility . . .
> A. Uh-huh.
> Q. But you remember them to be "3NG", correct?
> A. Yes.
> Q. . . . and were you familiar with guys of "3NG"?
> A. Some . . .
>
> * * *
>
> Q. You said that you know [the defendant] today?
> A. Uh-huh.
> Q. Do you see him in the courtroom?
> A. Yes, sir.
>
> * * *

Q. Are you able to look at him as you sit there today?
A. No. I don't want to look at him.
Q. Why?
A. Because I don't.
Q. What is it that doesn't make you want to look at him?
A. He's just evil.

Defense counsel then unsuccessfully urged a motion to strike Ms. Cole's response.

Ms. Cole's response that Mr. Hickerson was "evil" was unsolicited. Moreover, the foregoing exchange and Detective Lawless' subsequent testimony that Mr. Hickerson was arrested fleeing June's Bar was relevant as to explain why Ms. Cole might be hesitant to provide the names of 3NG members and the details of what she witnessed.

Even if the trial court erroneously admitted Ms. Cole's testimony regarding Mr. Hickerson's "evil" character, the error was harmless. "A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity or variance which does not affect substantial rights of the accused." La. C.Cr.P. art. 921. Error, if made by the trial court, is not fatal unless the defendant demonstrates prejudice. *State v. Humphrey*, 412 So.2d 507, 516 (La. 1981).

In *State v. Gibson,* 391 So.2d 421 (La.1980), the Louisiana Supreme Court adopted the "harmless error" test set forth by the United States Supreme Court in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The *Chapman* test asks whether there is a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction and requires that the reviewing court be able to declare a belief that the error was harmless beyond a reasonable doubt. *Gibson*, 391 So.2d at 428.

The burden of proving harmless error lies with the State. *Gibson,* 391 So.2d at 426. Considering the evidence of Mr. Hickerson's guilt in this case, we find

21

there is no reasonable possibility that Ms. Cole's assessment of Mr. Hickerson as "evil" contributed to the conviction for conspiracy to distribute heroin.[3]  Therefore, we find no merit to this assignment of error.

Mr. Hickerson next argues that the trial court abused its discretion in allowing the State to introduce evidence of other crimes.  The State filed its notice of intent to offer other crimes evidence pursuant to La. C.E. 412.2 and 404(B) in October 2014.  In response to defense counsel's discovery request, the State informed Mr. Hickerson that it intended to introduce "all acts committed by the defendant during the course of defendant's association with the criminal street gang, 3NG/106& Prieur/39ers, including previous acts (acts prior to the date of the indictment)".  Further, the State's response notified the defendant that "the other act evidence is intrinsic, therefore, it falls under the purview of *res gestae*" and directed the defendant to "the long-form indictment as well as the discovery material, provided to the Defendant's Counsel of Record . . ."

"A trial court's ruling on the admissibility of evidence will not be disturbed on appeal absent a clear abuse of the district court's discretion." *State v. D.D.*, 18-0891, p. 36 (La. App. 4 Cir. 12/27/19), 288 So.3d 808, 837.  "[O]nly those errors that were objected to at trial or based on 'the court's ruling on any written motion' are preserved for review."  *Id.*, 18-0891, p. 36, 288 So.3d at 837-838.  A trial court's "error in admitting inadmissible evidence will not be disturbed on appeal when the error is harmless."  *Id.*, 18-0891, p. 37, 288 So.3d at 838.  "Lastly, a [trial] court's decision to allow otherwise admissible substantive or impeachment evidence will constitute reversible error when its probative value is substantially

---

[3] As set out above, the racketeering conviction must be reversed based on the non-unanimous jury verdict.

outweighed by its prejudicial effect." *Id.*, 18-0891, p. 38, 288 So.3d at 839.

The record contains no indication that Mr. Hickerson objected to the sufficiency of the State's response or requested that the trial court order the State to supplement its response. To the contrary, the defense filed a motion for speedy trial in September 2015, thus tacitly acquiescing to the sufficiency of the State's discovery responses.

Nevertheless, the Louisiana Supreme Court set forth the applicable law in *State v. Rose*, 06-0402, p. 12-13 (La. 2/22/07), 949 So.2d 1236, 1243-44, as follows:

> It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1); *State v. Williams*, 96-1023, p. 30 (La.1/21/98), 708 So.2d 703, 725; *State v. Prieur*, 277 So.2d 126, 128 (La.1973). Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." *Prieur*, 277 So.2d at 128. However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1). The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. *Prieur*, 277 So.2d at 130. Even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. *State v. Martin*, 377 So.2d 259, 263 (La.1979); *Prieur*, 277 So.2d at 130. The State also bears the burden of proving that defendant committed the other crimes, wrongs or acts. *State v. Galliano*, 2002-2849, p. 2 (La.1/10/03), 839 So.2d 932, 933 (*per curiam*).
>
> Although a defendant's prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. *State v. Germain*, 433 So.2d 110, 118 (La.1983). As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. *Id. See also Old Chief v. United*

*States,* 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."). (Footnote omitted).

"A trial court's ruling on the admissibility of evidence pursuant to La. C.E. art. 404 B(1) will not be disturbed absent an abuse of discretion." *State v. Everett,* 11-0714, p. 40 (La. App. 4 Cir. 6/13/12), 96 So.3d 605, 633.

On the day of opening statements, defense counsel objected that it had not received notice of the State's intent to introduce other crimes evidence of Mr. Hickerson's involvement in the murders of Alexis Williams, LeDevin Pearson, Brian Johnson and Alvin Wilson in unrelated incidents in 2002, 2003, 2004 and 2008. The defense argued that the State's only purpose in proffering the evidence of the murders was to portray Mr. Hickerson as a violent criminal, and that no showing had been made that the evidence was more probative than prejudicial.

Testimony elicited at trial indicated that the four murders were committed in order to enhance the reputation of 3NG reputation and/or eliminating rival drug dealers. During a hearing on the admissibility of the evidence, the trial court stated:

> The Court also notes that the record that the very nature of this prosecution that the State is alleging, racketeering and criminal street gang activity, that this evidence is not cumulative but it is highly relevant to the State's advancement of their of theory of prosecution and as such, the court has allowed it in.

The evidence is admissible pursuant to La. C.E. art. 404(B), "as an integral part of the act or transaction that is the subject of the present proceeding" (the racketeering conspiracy) and to establish a pattern of racketeering activity under the exceptions listed in La. C.E. art. 404(B). The trial court did not abuse its discretion in admitting the evidence. Likewise, evidence regarding Mr. Hickerson's

24

involvement in an incident in which armed members of 3NG entered June's Bar at Fourth and Dryades Streets on the night of March 21, 2005 was likewise admissible to prove the racketeering count.

Evidence depicting a string of violence that highlighted 3NG's reputation of eliminating rivals rebuts Mr. Hickerson's argument that 3NG was not a gang. In addition, defense counsel attacked the testimony of the 404(B) witnesses by cross-examination and called to the jury's attention that Mr. Hickerson was acquitted of the murder of Alvin Wilson and that he was not charged with the murder of Alexis Williams. The probative nature of the evidence outweighs its prejudicial effect. Thus, this assignment of error has no merit.

### *MOTION FOR NEW TRIAL*

Next, Mr. Hickerson argues that his second motion for new trial should have been granted because newly discovered evidence undermines confidence in the trial's outcome. Mr. Hickerson maintains that less than a year after trial of this case, he learned that State's witness, Tyrone Knockum, expected quid-pro-quo leniency in exchange for his testimony, and that Knockum fabricated his testimony linking Mr. Hickerson to the LRA-predicate murder of Omar Breaux. Mr. Hickerson further contends that another State witness, Washington McCaskill, believed it was necessary to fabricate evidence to secure better plea agreements.

La. C.Cr.P. art. 851 sets forth the grounds for a new trial, and states in pertinent part:

> A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
> B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:

(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.

"A defendant bears the burden of proof when seeking a new trial as a result of his conviction, previously obtained by the prosecution." *State v. Hayes*, 17-0789, p. 28 (La. App. 4 Cir. 3/27/19), -- So.3d --, -- (citing *State v. Armstead*, 14-0036, p. 25 (La. App. 4 Cir. 1/28/15), 159 So.3d 502, 519.) Appellate review will only be invoked to consider error of law. La. C.Cr.P. art. 858; *Hayes*, 17-0789, p. 28, -- So.3d --, -- (citing *State v. McKinnies*, 13-1412, p. 9 (La. 10/15/14), 171 So.3d 861, 869). "When the allegations of a motion for new trial are not supported by proof, a trial judge properly overrules the motion. Allegations raised in the motion alone are not sufficient, as a defendant has the burden to show that an injustice has been done to him." *Hayes*, 17-0789, p. 29, -- So.3d at -- (citing *McKinnies*, 13-1412, p. 11, 171 So.3d at 870).

Under La. C.Cr.P. 851, newly discovered evidence must first be determined to be "material." Evidence is material only if it is "reasonably probable that the result of the proceeding would have been different had the evidence been disclosed." *Hayes*, 17-0789, p. 13, -- So.3d at --. "A reasonable probability is one that is sufficient to undermine confidence in the outcome" of the trial. *Id.*, 17-0789, p. 29, -- So.3d at -- (citing *Marshall*, 94-0461, p. 16, 660 So.2d at 826).

The Due Process clause of the Fourteenth Amendment requires that the State disclose to the defense evidence that is favorable to the defense and is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10

26

L.Ed.2d 215 (1963); *State v. Hollins*, 11-1435, p. 23 (La. App. 4 Cir. 8/29/13), 123 So.3d 840, 858.

In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to the accused after receiving a request for it violates a defendant's due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. *Id.*, 373 U.S. at 87, 83 S.Ct. at 1196-97. The *Brady* rule encompasses evidence that impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *State v. Knapper*, 579 So.2d 956, 959 (La. 1991). *Brady* and its progeny, however, do not establish a general rule of discoverability. A prosecutor does not breach his constitutional duty to disclose favorable evidence "unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976); *State v. Willie,* 410 So.2d 1019, 1030 (La. 1982). For purposes of *Brady's* due process rule, a reviewing court determining materiality must ascertain:

> . . . not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (citing *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381); *see also State v. Strickland*, 94-0025, p. 38 (La. 11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not

27

put the material to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a *Brady* violation occurs when the "evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381); *See also State v. Bright*, 02-2793, p. 5-6 (La. 5/25/04), 875 So.2d 37, 43.

The trial court held an evidentiary hearing on the second motion for new trial in January 2018, at which testimony was taken from Assistant District Attorney Alex Calenda and multiple exhibits were introduced. The motion for new trial was denied in July 2019. The trial transcript reflects that on direct examination, the prosecutor inquired of Tyrone Knockum:

> Q. . . . you're here today based upon a plea agreement, correct?
> A. Yeah.
> Q. And one day you hope to be able to come home.
> A. Yeah.
> Q. Do you think that day is tomorrow?
> A. No.
> Q. You think that day is next month?
> A. No.
> Q. But you understand, what the one rule throughout all of this is . . .
> A. Tell the truth.
> * * *
> Q. . . . you hope your testimony and your cooperation does what one day?
> A. One day I'll be able to go home. . .

Additionally, during cross-examination, the following exchange occurred between Knockum and defense counsel:

> Q. Okay. Now, you've admitted that you killed these two people [Renetta Lowe, aka "Magnolia Shorty" and Jerome Hampton, aka "Man Man,"] but you are not going to go to jail for the rest of your life, are you, Mr. Knockum?
> A. . . . I didn't say that, I said I don't want to spend the rest of my life in jail.
> Q. . . . you signed what the lawyers like to call a "global plea agreement." Isn't that true?

A.  Yeah.  But on the global plea, ain't nothing promised. . .
Q.  The global plea agreement is between the State of Louisiana, the federal government and you.  Isn't that correct?
A.  Yeah

\* \* \*

Q.  . . . Let's see, you pled guilty to killing people but instead of going to jail for life, you get 20 years in state custody, according to this document, correct?
A.  Yeah.
Q.  . . . But that's not all.  That's not where the sweetheart deal of all sweetheart deals . . . because this plea agreement is taken what they call "coterminous"?

\* \* \*

A.  What does [coterminous] mean?
Q.  It means . . . that if in the federal case that you're currently in, the judge sentences you to less than 20 years, your  state sentence for 20 years goes down to the same level as the federal verdict (sic). . .
A.  Yeah . . .

Q.   . . . according to the documents that means that if the federal sentence you get is less than 20 years, you will only do the lower federal amount of your sentence. . .
A.  Yeah . . .
Q.  Okay.  And in fact you don't have to even do it in Louisiana State custody, you can do it in the custody of the Bureau of Prisons; isn't that correct?
A. Yeah.
Q.  . . . That's a lot better than Angola, isn't it?
A.  I don't know, I've never been upstate.
Q.   . . . You'll never get to know what Angola is all about . . . because you have a sweetheart plea agreement; isn't that correct?
A.  No.
Q.  No?  What about what I just said is not correct?
A.  The sweetheart deal plea or whatever it was you said.
Q.  Would you rather be in jail for the rest of your life until you die or possibly executed by lethal injection or would you rather go home in maybe 20 years?

\* \* \*

A.  Getting out and going home.

The foregoing trial excerpts demonstrate that whether Tyrone Knockum received any benefit in exchange for his testimony against Mr. Hickerson was

29

explored in detail during direct and cross-examination. Defense counsel ensured the jury knew Knockum had a "deal" with the State for his testimony against Mr. Hickerson, and that the "deal" was the primary basis for Knockum's testimony. Moreover, the State fully vetted its witnesses Brandon Morgan, James Davis, Ashley Brooks, Rico Jackson and Washington McCaskill as to their plea deals and expectations based upon their cooperation. The jury was informed that Knockum was anticipating favorable consideration from the prosecutor. The jury was fully aware that Knockum's testimony could have been affected by a "deal" and made their assessment of his credibility in light of that knowledge. We find this assignment of error meritless.

## *CONCLUSION*

While we find the evidence sufficient to establish Mr. Hickerson's guilt as to both counts, patent error review reveals the jury's verdict on count one, conspiracy to commit racketeering was non-unanimous. Pursuant to *Ramos*, Mr. Hickerson's conviction and sentence for conspiracy to commit racketeering (count one) must be vacated as unconstitutional and the matter remanded for further proceedings. Additionally, that the jury's verdict was unanimous as to count two, conspiracy to distribute heroin in furtherance of gang activity. Therefore no error or corrective action is required as to count two. Moreover, and as stated above, we find the evidence is sufficient to support the jury's verdict. Consequently, we affirm Mr. Hickerson's conviction as to conspiracy to distribute heroin in furtherance of gang

activity.  Accordingly, we affirm in part and vacate in part, and remand the matter for further proceedings in line with this opinion.

**AFFIRMED IN PART; VACATED IN PART**